## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| Plaintiff, | |
| v. | No. 1:24-cv-02234-DLF |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al.*, | |
| Defendants, | |
| and | |
| MSN PHARMACEUTICALS INC., *et al.*, | |
| Intervenor-Defendants. | |

### Federal Defendants' Opposition to Novartis's Motion for Temporary Restraining Order or Preliminary Injunction

OF COUNSEL:

SAMUEL R. BAGENSTOS
General Counsel
U.S. Department of Health and Human
   Services

MARK RAZA
Chief Counsel
Food and Drug Administration

WENDY S. VICENTE
Deputy Chief Counsel, Litigation

LEAH A. EDELMAN
Associate Chief Counsel
Office of the Chief Counsel
Food and Drug Administration

BRIAN M. BOYNTON
Principal Deputy Assistant
   Attorney General

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Senior Deputy Director

HILARY K. PERKINS
Assistant Director

GABRIEL I. SCHONFELD
   (D.C. Bar No. 155539)

10903 New Hampshire Ave.
White Oak Building 31
Silver Spring, MD 20993-002

Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044-0386
(202) 353-1531
(202) 514-8742 (fax)
Gabriel.I.Schonfeld@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

BACKGROUND..................................................................................................................2

    A.    Statutory and Regulatory Background ...................................................2

    B.    The Entresto® Package Insert ...............................................................4

    C.    Novartis's Listed Patents and Citizen Petition .....................................8

    D.    MSN's ANDA and Carved Out Labeling............................................10

LEGAL STANDARDS .........................................................................................................12

ARGUMENT.....................................................................................................................13

    I.    Novartis Has No Likelihood of Success on the Merits............................13

    A.    The Use Carve Out Lawfully Omits a Patent-Protected Use by Adding Language Which Excludes It. ...............................................13

    B.    FDA Reasonably Determined That the Dosage Carve Out Would Not Compromise Safety or Effectiveness..................................18

    II.    Novartis's Allegations of Purely Economic Injury Do Not Establish Irreparable Harm. ..........................................................................................20

    III.    Neither the Balance of Harms Nor the Public Interest Favor an Injunction. ......23

CONCLUSION...................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Am. Immigr. Council v. DHS,*
  470 F. Supp. 3d 32 (D.D.C. 2020) ...................................................................12

*\*Arrow Air, Inc. v. United States,*
  649 F. Supp. 993 (D.D.C. 1986) ....................................................................21

*Astellas Pharma US, Inc. v. FDA,*
  642 F. Supp. 2d 10 (D.D.C. 2009) .............................................................23, 24

*Biovail Corp. v. FDA,*
  448 F. Supp. 2d 154 (D.D.C. 2006) ................................................................23

*Biovail Corp. v. FDA,*
  519 F. Supp. 2d 39 (D.D.C. 2007) ..................................................................12

*\*Bristol-Myers Squibb Co. v. Shalala,*
  91 F.3d 1493 (D.C. Cir. 1996)...................................................................13, 17

*Bristol-Myers Squibb Co. v. Shalala,*
  923 F. Supp. 212 (D.D.C. 1996) ....................................................................21

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S,*
  566 U.S. 399 (2012) ...........................................................................9, 10, 17

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006)........................................................................20

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ......................................................................................12

*Coal. for Common Sense in Gov't Procurement v. United States,*
  821 F. Supp. 2d 275 (D.D.C. 2011) ................................................................12

*Loper Bright Enterprises v. Raimondo,*
  144 S. Ct. 2244 (2024) ..................................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................12

*Mylan Lab'ys Ltd. v. FDA,*
  910 F. Supp. 2d 299 (D.D.C. 2012) ................................................................21

*PLIVA, Inc. v. Mensing,*
  564 U.S. 604 (2011).......................................................................................13

*Rempfer v. Sharfstein,*
  583 F.3d 860 (D.C. Cir. 2009).........................................................................18

*Serono Lab'ys, Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998) ................................................................................24

*TGS Tech., Inc. v. Dept. of Air Force*,
  1992 WL 19058 (D.D.C. Jan. 14, 1992) ...................................................................21

*Vanda Pharms, Inc. v. FDA*,
  Prelim. Inj. Mot. Hr'g Tr., ECF No. 36, No. 1:23-cv-280-TSC (D.D.C. Mar. 6, 2023) .....22

*Varicon Int'l v. Office of Personnel Mgmt.*,
  934 F. Supp. 440 (D.D.C. 1996) ...............................................................................21

*Watson Lab'ys, Inc. v. Sebelius*,
  2012 WL 13076147 (D.D.C. Oct. 23, 2012) ...............................................................21

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ...................................................................................................12

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .................................................................................21

*Xiaomi Corp. v. Dept. of Defense*,
  2021 WL 950144 (D.D.C. Mar. 12, 2021) .................................................................22

**Statutes**

5 U.S.C. § 706(2)(A) ...............................................................................................12

21 U.S.C. §

  355(a) ....................................................................................................................2
  355(j) ....................................................................................................................3
  355(j)(2)(A)(i) ........................................................................................................3
  355(j)(2)(A)(ii) .......................................................................................................3
  355(j)(2)(A)(iii) ......................................................................................................3
  355(j)(2)(A)(iv) ......................................................................................................3
  *355(j)(2)(A)(v) ..............................................................................................passim
  355(j)(2)(A)(vi) ......................................................................................................3
  355(j)(2)(A)(viii) ....................................................................................................9

**Regulations**

21 C.F.R. §
  201.100(d) ..............................................................................................................3
  201.100(d)(1) ..........................................................................................................3
  201.56 ....................................................................................................................3
  201.57 ....................................................................................................................3
  *314.127(a)(7) ...............................................................................................4, 13, 18
  314.3(b) ..................................................................................................................3
  314.50(l)(1)(i) .........................................................................................................3
  314.92(a)(1) ............................................................................................................4

314.94(a)(3) ................................................................................................................3
314.94(a)(4) ................................................................................................................3
314.94(a)(5) ................................................................................................................3
314.94(a)(6) ................................................................................................................3
314.94(a)(7) ................................................................................................................3
314.94(a)(8) ................................................................................................................3
*314.94(a)(8)(iv) ................................................................................................ passim
314.94(a)(12)(iii)(A) ....................................................................................................9

\* Indicates those cases or authorities on which counsel chiefly relies. Local Civ. R. 7(a).

## INTRODUCTION

The Federal Food, Drug, and Cosmetic Act (FDCA) strikes a careful balance between protecting the patent rights of brand-name drug companies and promoting consumer access to safe and effective low-cost generics. Although a generic drug usually must have the same labeling as its brand-name predecessor, federal law allows the U.S. Food and Drug Administration (FDA) to approve generic labeling which "carves out" portions of the brand's labeling that describe a patent-protected method of using the drug. FDA will review a proposed carve out under the agency's regulations both to confirm that it corresponds to a patent listed in the agency's "Orange Book," and to ensure that approving it would not make the generic less safe or effective for the remaining non-protected uses. This litigation challenges FDA's straightforward application of the law to approve two labeling changes proposed by Intervenor-Defendants MSN Pharmaceuticals Inc. and MSN Laboratories Private Ltd. ("MSN").

MSN sought FDA approval for generic sacubitril and valsartan, a heart failure medication marketed by Plaintiff Novartis Pharmaceuticals Corp. ("Novartis") under the brand name Entresto®. MSN's application contained two changes from the Entresto® label—the "Use Carve Out" and the "Dosage Carve Out." The Use Carve Out omitted Entresto®'s use for heart failure in some patients with *normal* ejection fraction (a measure of how well the heart is contracting) by adding language specifying that MSN's generic is approved only for heart failure with *reduced* ejection fraction. The Dosage Carve Out omitted instructions for starting a certain subset of patients on a reduced dose of Entresto®. FDA approved MSN's application with both labeling changes, and simultaneously denied a citizen petition that Novartis had filed asking that the agency refuse to do so.

Novartis now seeks a temporary restraining order or preliminary injunction against FDA's approval before MSN is able to launch its generic product in the market.

That motion should be denied because Novartis has not met its burden to show that it is entitled to extraordinary emergency relief.

*First*, Novartis is not likely to succeed on the merits of its claims. With respect to the Use Carve Out, there is no legal or logical basis for Novartis's claim that generic labeling may only omit a patented use by deleting words from (rather than adding them to) the reference drug's labeling. Rather, the question under the FDCA and FDA's regulations is whether the substance of the change omits a patent-protected use. And with respect to the Dosage Carve Out, Novartis has not shown that FDA acted arbitrarily or capriciously when it applied its scientific expertise to determine that omitting Novartis's patent-protected modified dosing regimen would not make MSN's generic product less safe or effective than Entresto® for its remaining unprotected uses.

*Second*, Novartis has not shown that it will suffer irreparable harm without emergency relief. Novartis is one of the largest and most profitable pharmaceutical firms in the world. Taking the company's assertions of immediate monetary loss at face value, Novartis has shown that it will lose at most around 5% of its $45 billion in annual sales. That is not the sort of devastating harm that courts in the D.C. Circuit have found to be irreparable.

*Third*, Novartis has not shown that the balance of harms or the public interest favor an injunction. Novartis has no legitimate interest in enjoining FDA's lawful actions or blocking competition from a lawfully approved generic drug. The public at large and MSN, by contrast, have a substantial interest in vindicating the FDCA's public policy in favor of rapid approval for safe, effective, and low-cost generic drugs.

BACKGROUND

## A.  Statutory and Regulatory Background

Like any other new drug, a generic drug can be marketed in the United States only with FDA's approval. 21 U.S.C. § 355(a). As relevant here, approval to market a

2

generic drug may be sought by filing an abbreviated new drug application (ANDA). *Id.* § 355(j).

Because an ANDA relies on FDA's finding that a previously approved drug (the "reference" drug) is safe and effective, *id.* § 355(j)(2)(A)(i); 21 C.F.R. § 314.3(b) (defining "Reference listed drug"), § 314.94(a)(3), the applicant does not have to repeat the studies that established the reference drug's safety and efficacy. Rather, it must show that the generic drug is bioequivalent to the reference drug and has the same active ingredient(s), conditions of use, strength, dosage form, and route of administration. *See* 21 U.S.C. § 355(j)(2)(A)(i)-(iv); 21 C.F.R. § 314.94(a)(4)-(7). A generic drug must also meet quality standards. 21 U.S.C. § 355(j)(2)(A)(vi).

Finally, subject to statutory and regulatory exceptions, the generic and reference drugs must have the same labeling. 21 U.S.C. § 355(j)(2)(A)(v); 21 C.F.R. § 314.94(a)(8). One component of that labeling is the "package insert," which contains detailed information for prescribers about the safe and effective use of the drug. *See* 21 C.F.R. §§ 201.100(d), 314.50(l)(1)(i); *see also* Entresto® Package Insert, ECF No. 1-1 (Novartis Mot. Ex. A); MSN Package Insert (Defs. Opp. Ex. A). This includes information about "indications," "dosages," the "frequency and duration of administration," and any "relevant warnings, hazards . . . and precautions." *See id.* § 201.100(d)(1); *see also id.* §§ 201.56, 201.57.

For present purposes,[1] Novartis's claims turn on whether the Use Carve Out and Dosage Carve Out satisfy the FDCA's exception to the "same labeling" requirement for

---

[1] Novartis's Complaint also alleges that FDA wrongly determined (in response to a different citizen petition than the one underlying its motion) that MSN's product has the same active ingredient as Entresto®. *See* Compl. ¶¶ 42-47, 72-75. *See also* FDA "Same Active Ingredient" Citizen Petition Response, ECF No. 1-7 (May 28, 2024) (Novartis Mot. Ex. G). On the same day it denied that petition, FDA approved three additional ANDAs referencing Entresto® (ANDA 213676, ANDA 213605, and ANDA 213682), with a fourth (ANDA 214719) approved just over a month later. Novartis's motion, however, does not seek emergency relief based on the agency's denial of the "Same Active Ingredient" Citizen Petition.

"changes [that are] required . . . because the [generic] drug and the [reference] drug are produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). This "different manufacturer" exception is codified in FDA's regulations. In relevant part, a generic manufacturer may "omi[t] . . . an indication or other aspect" of the reference drug's labeling that is "protected by patent." 21 C.F.R. § 314.94(a)(8)(iv); *see also id.* § 314.92(a)(1) ("[T]he term 'same as' means identical in . . . conditions of use, except that conditions of use for which approval cannot be granted because of . . . an existing patent may be omitted."), § 314.127(a)(7) (permitting approval of "changes required because . . . aspects of the [reference] drug's labeling are protected by patent"). FDA will not, however, approve labeling changes that "render the [generic] drug product less safe or effective than the [reference] drug for all remaining, nonprotected conditions of use." *Id.* § 314.127(a)(7).

### B. The Entresto® Package Insert

Entresto® (sacubitril and valsartan) is a heart failure medication first approved by FDA in 2015. *See generally* Entresto® Approval Letter (July 7, 2015), https://perma.cc/KJ8G-X3RV. Two aspects of the Entresto® package insert are relevant here—its description of the disease the drug is indicated to treat in adults, and its discussion of how prescribers may manage each individual patient's dosage level.

*Approved Indication.* The Entresto® package insert describes the drug's approved indication for adult patients as follows:

> ENTRESTO is indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure. Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal.
>
> LVEF is a variable measure, so use clinical judgment in deciding whom to treat.

Entresto® Package Insert, ECF No. 1-1 at § 1.1. LVEF is "one of many measures of cardiac performance used in clinical practice to diagnos[e] and treat patients with

4

chronic [heart failure]." FDA 2024 Citizen Petition Response, ECF No. 1-8 at 11 (Novartis Mot. Ex. H). It measures the percentage of the blood in the heart's left ventricle (one of the heart's four chambers) that is pumped out each time that ventricle contracts. *Id.* Normal LVEF is in the range of 52%-72% for men and 54%-74% for women. *Id.* Below-normal LVEF is strong evidence that the heart is not contracting properly. *Id.*

Entresto®'s current indication statement is broader than the one FDA initially approved. The Entresto® package insert originally indicated the drug for treatment of adult "patients with chronic heart failure . . . **and reduced ejection fraction**." *See* 2015 Entresto® Package Insert, ECF No. 1-9 at § 1.1 (Novartis Mot. Ex. I) (emphasis added). That language was based on the scope of the clinical study (the "PARADIGM" trial) submitted to support Entresto®'s effectiveness—which only enrolled patients with LVEF at or below what Novartis described as an "arbitrary . . . cut-point" of 40%. *See* FDA 2024 Citizen Petition Response, ECF No. 1-8 at 14-15 & n.70, 26 (quotation omitted). The entire PARADIGM patient population, in other words, had below-normal LVEF. The original Entresto® package insert accurately reflected that fact by stating that Entresto® was indicated for the same population in which its safety and effectiveness had been established—patients with "*reduced* (or *below normal*)" ejection fraction. *Id.* at 28; *see also id.* at 26 (explaining that in the "clinical setting" the phrase "'[heart failure] and reduced ejection fraction' . . . [means] impaired contraction supported by LVEF data below normal").

Following Entresto®'s initial approval, Novartis completed another clinical study of the drug's effectiveness (the "PARAGON" trial). Unlike PARADIGM, which enrolled only patients with below-normal LVEF, PARAGON enrolled patients with LVEF at or *above* 45%—a criterion which included "patients with mildly reduced LVEF *and* patients with normal LVEF." *Id.* at 18 (emphasis added). PARAGON demonstrated that Entresto® is effective in patients who met that criterion, *id.* at 32-33, but did not as

clearly show a benefit in the subgroup of patients with normal LVEF, *id.* at 30. FDA approved an updated indication statement based on the PARAGON results in early 2021 (the "2021 Supplemental Approval"). That updated statement—which still appears in the current Entresto® package insert—"broadened the indication, in part by dropping [the word] *reduced*," while also adding language "suggest[ing] that [Entresto®] may not be effective at the upper range of LVEF." *Id.* at 31. The relevant differences between the original and current Entresto® adult indication statements are shown below:

| Original Entresto® Indication Statement | Current Entresto® Indication Statement |
|---|---|
| ENTRESTO is indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in patients with chronic heart failure . . . and reduced ejection fraction.<br><br>2015 Entresto® Package Insert, ECF No. 1-9 at § 1.1. | ENTRESTO is indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in **adult** patients with chronic heart failure ~~. . .and reduced ejection fraction~~. **Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal.**<br><br>**LVEF is a variable measure, so use clinical judgment in deciding whom to treat.**<br><br>Entresto® Package Insert, ECF No. 1-1 at § 1.1. |

*Dose Management.* Multiple portions of the Entresto® package insert instruct prescribers that based on their clinical judgment, they may manage the risk of adverse events by prescribing a reduced dose of the drug. As relevant here, Section 2.6 of the package insert addresses patients who immediately prior to starting Entresto® are not taking, or are taking only low doses of, two types of medication—angiotensin-converting enzyme (ACE) inhibitors and angiotensin II receptor blockers (ARBs)—that have a similar effect on the circulatory system as does Entresto®:

### 2.6 Dose Adjustment for Patients Not Taking an ACE inhibitor or ARB or Previously Taking Low Doses of These Agents

In patients not currently taking an ACE inhibitor or an angiotensin II receptor blocker (ARB) and for patients previously taking low doses of these agents, start ENTRESTO at half the usually recommended starting dose. After initiation, increase the dose every 2 to 4 weeks in adults . . . to follow the recommended dose escalation thereafter.

Entresto® Package Insert, ECF No. 1-1 at § 2.6. This modified dosing regimen is based on the results of another study (the "TITRATION" study) that Novartis submitted to support the safety and tolerability of Entresto®. FDA 2024 Citizen Petition Response, ECF No. 1-8 at 15-16. TITRATION compared 1) patients who initially received 100mg of Entresto® twice daily, increased to 200mg over two weeks, with 2) patients who initially received 50mg of Entresto® twice daily, increased to 200mg over five weeks. *Id.* at 16. Before being assigned to one of those two groups, all participants in TITRATION were required to tolerate taking 50mg twice daily for one week. *Id.* at 16, 40.

Both groups studied in TITRATION experienced similar rates of Entresto®'s most common adverse events, *id.* at 40, and "FDA determined that . . . [the study] showed that Entresto® was well tolerated . . . following *either* a condensed or conservative [dosing] regimen[]," *id.* at 16 (emphasis added). The agency also noted, however, that patients who before TITRATION were not taking (or were taking a low dose of) an ACE inhibitor or ARB "were better able to achieve and maintain the target dose" of Entresto® if their dose increased more gradually, "whereas the rate of [increase] was less important in patients who were taking higher pre-study doses" of an ACE inhibitor or ARB. *Id.* at 16.

Based on those results, FDA concluded that Novartis's proposed modified dosing regimen was "reasonable" because it "*may* reduce the risk" of three adverse events—low blood pressure, kidney impairment, and excess potassium levels—"in patients previously on a low dose of an [ACE inhibitor] or ARB." *Id.* at 16, 40-41

7

(emphasis added) (quotations omitted); *see also id.* at 16 n. 83 ("The results of . . .
TITRATION[] suggest[] that patients who were previously on [a] low dose of [ACE
inhibitors or] . . . ARBs *might* benefit from a slow up-titration regimen . . . to increase
tolerability and reduce the risk of adverse events . . . .") (emphasis added) (quotations
omitted).

Section 2.6, however, is not the Entresto® package insert's only instruction on
managing risk by reducing dosage. Section 5 of the insert—"Warnings and
Precautions"—independently advises prescribers that the risk of low blood pressure,
kidney impairment, and excess potassium levels may be mitigated with a reduced
initial dose of Entresto®. The same three risks also underlie TITRATION's addition of
section 2.6 to the labeling—so even if the modified dosing regimen in 2.6 is carved out,
the continued inclusion of these risks and generalized mitigation recommendations
ensures that such labeling is not less safe and effective than the reference drug for the
remaining nonprotected conditions of use. The risk of low blood pressure (hypotension)
may be managed by "start[ing] at a lower dose." Entresto® Package Insert, ECF No. 1-1
at § 5.3. Kidney (renal) impairment may be addressed by "down-titrat[ing]" (lowering)
a patient's dosage. *Id.* § 5.4. And "[d]osage reduction . . . may be required" to address
the risk of excess potassium levels (hyperkalemia). *Id.* § 5.5. Moreover, "published
guidelines on [heart failure] treatment" show that even before Entresto®'s approval,
best clinical practice had long "supported a general up-titration approach guided by
tolerability" and did not treat patients with no (or only a low-dose) history of ACE-
inhibitor or ARB use "as an at-risk group." FDA 2024 Citizen Petition Response, ECF
No. 1-8 at 41 & n.185.

### C. Novartis's Listed Patents and Citizen Petition

In the months following the 2021 Supplemental Approval, Novartis submitted
the four patents relevant to its motion to FDA for listing in *Approved Drug Products with
Therapeutic Equivalence Evaluations*—more commonly known as the "Orange Book." *See*

FDA, *Patent and Exclusivity for NDA N207620*,

https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=002&

Appl_No=207620&Appl_type=N (last visited Aug. 6, 2024).

The Orange Book is an FDA publication which lists patents covering approved

drugs. For "method-of-use" patents—which protect a method of using a drug product

rather than a feature of the product itself—the Orange Book includes a description of

the claimed use called a "use code." *See generally Caraco Pharm. Lab'ys, Ltd. v. Novo*

*Nordisk A/S*, 566 U.S. 399, 405-07 (2012). Three of the four patents relevant here (the "Use

Patents") are listed in the Orange Book for "Treatment of Heart Failure with Preserved

Ejection Fraction" (use code U-3084). *See* FDA 2024 Citizen Petition Response, ECF No.

1-8 at 21 (citing U.S. Patents Nos. 9,517,226; 9,937,143; and 11,135,192). The fourth patent

(the "Dosage Patent") is listed for "Treating Chronic Heart Failure With Reduced

Ejection Fraction in Patients Not Taking an ACE Inhibitor or an ARB or Previously

Taking Low Doses of These Agents by Titrating Up from Half the Usually

Recommended Starting Dose" (use code U-3170). *See id.* at 21-22 (citing U.S. Patent No.

11,058,667).

Subject to other requirements not at issue here, a generic manufacturer may

include in its ANDA a "section viii statement" regarding a method-of-use patent listed

in the Orange Book. A section viii statement explains that "the labeling for the

[proposed generic drug] . . . does not include [the] indication or other condition of use

that is covered by" the patent's listed use code. 21 C.F.R. § 314.94(a)(12)(iii)(A); *see also*

21 U.S.C. § 355(j)(2)(A)(viii). "If the ANDA applicant follows this route, it will propose

labeling for the generic drug that 'carves out' from the brand's approved label the still-

patented methods of use." *Caraco Pharm.*, 566 U.S. at 406 (quotation omitted). As

discussed above, "FDA may approve such a modified label as an exception to the usual

rule that a generic drug must bear the same label as the brand-name product." *Id.*

(quotation omitted); *see also supra* at 2-4.

9

After Novartis submitted the last of the Use Patents to be listed in the Orange Book, it submitted a citizen petition to FDA asking that the agency refuse to approve any ANDA that referenced Entresto® and contained a section viii statement regarding either the Use Patents or the Dosage Patent.[2] *See* Novartis 2022 Citizen Petition, ECF No. 1-6 (Novartis Mot. Ex. F). FDA denied Novartis's petition on July 24, 2024. *See generally* FDA 2024 Citizen Petition Response, ECF No. 1-8.

### D. MSN's ANDA and Carved Out Labeling

MSN submitted its ANDA for generic sacubitril and valsartan in 2019. *See* MSN ANDA Approval Letter at 1 (July 24, 2024) (Defs. Opp. Ex. B). FDA approved the MSN ANDA on the same day it denied Novartis's citizen petition. *Id.* As approved, MSN's ANDA includes section viii statements regarding both the Use Patents and the Dosage Patent. *Id.* Those statements correspond with two labeling changes (or "carve outs") omitting uses covered[3] by Novartis's patent claims.

---

[2] Novartis initially submitted a citizen petition raising these issues on November 30, 2021. *See* Novartis 2021 Citizen Petition., Dkt. No. FDA-2021-P-1286-0001 (Nov. 30, 2021). But FDA denied that petition on threshold grounds unrelated to the merits of Novartis's present claims. *See* FDA 2022 Citizen Petition Response, Dkt. No. FDA-2021-P-1286-0014 (April 29, 2022). Novartis renewed its requests several months later in the substantively identical citizen petition underlying this lawsuit.

[3] Here and throughout this memorandum, description of a use as being "covered," "protected," "claimed," or similar by a listed patent refers only to the fact that it is within the use code listed in the Orange Book. FDA does not "independently assess [a] patent's scope or otherwise look behind" the listed use code. *Caraco Pharm.*, 566 U.S. at 406. The agency's "role with respect to patent listing is ministerial," *id.* at 407. (quotation omitted), and FDA takes no position on the scope or validity of the underlying patents themselves. Novartis has asserted its patent rights for the Use Patents and Dosage Patent against MSN and others. *See, e.g., Novartis Pharms. Corp. v. MSN Pharms. Inc., et al*, No. 1:22-cv-1395 (D. Del.). On August 2, 2024, Novartis moved for a preliminary injunction against MSN in its pending patent litigation. *Id.*, ECF No. 213. The court will hold a hearing regarding that motion at 9:00 AM on August 9, 2024.

***The Use Carve Out.*** To exclude the use covered by the Use Patents—"treatment of heart failure with preserved ejection fraction"—the MSN package insert modifies Entresto®'s adult indication statement as follows:

| Entresto® Package Insert | MSN Package Insert |
|---|---|
| ENTRESTO is indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure. Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal.<br><br>LVEF is a variable measure, so use clinical judgment in deciding whom to treat.<br><br>Entresto® Package Insert, ECF No. 1-1 at § 1.1. | Sacubitril and valsartan tablets are indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure~~.~~ **and reduced ejection fraction.** ~~Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal.~~<br><br>~~LVEF~~**Left ventricular ejection fraction (LVEF)** is a variable measure, so use clinical judgment in deciding whom to treat.<br><br>MSN Package Insert at § 1.1 (Defs. Opp. Ex. A). |

***The Dosage Carve Out.*** To carve out the use protected by the Dosage Patent— "treating chronic heart failure with reduced ejection fraction in patients not taking an ACE inhibitor or an ARB or previously taking low doses of these agents, by titrating up from half the usually recommended starting dose"—MSN's labeling omits Section 2.6 of the Entresto® package insert entirely:

| Entresto® Package Insert | MSN Package Insert |
|---|---|
| **2.6    Dose Adjustment for Patients Not Taking an ACE inhibitor or ARB or Previously Taking Low Doses of These Agents**<br><br>In patients not currently taking an ACE inhibitor or an angiotensin II receptor blocker (ARB) and for patients previously taking low doses of these agents, start ENTRESTO at half the usually recommended starting dose. After initiation, increase the dose every 2 to 4 | N/A<br><br>*See* MSN Package Insert §§ 2.4-.7 (Defs. Opp. Ex. A). |

11

| | |
|---|---|
| weeks in adults . . . to follow the recommended dose escalation thereafter.<br><br>Entresto® Package Insert, ECF No. 1-1 at § 2.6. | |

## LEGAL STANDARDS

***Temporary Restraining Order or Preliminary Injunction.*** Interim injunctions are "an extraordinary form of judicial relief" that courts grant "sparingly" and only where "the movant, by a clear showing, carries the burden of persuasion." *Biovail Corp. v. FDA*, 519 F. Supp. 2d 39, 43-44 (D.D.C. 2007) (quotations omitted). To obtain preliminary injunctive relief, Novartis has the burden of showing (1) that it is likely to succeed on the merits of its claims, (2) that it is likely to suffer irreparable harm without preliminary relief, (3) that the balance of equities favors an injunction, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where a federal agency is the defendant, the last two factors merge. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

***Administrative Procedure Act Claims.*** The agency in an APA case is entitled to prevail on the merits when its actions were consistent with the APA's standard of review. *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011). The question is whether the challenged action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In applying the highly deferential arbitrary-and-capricious standard, the reviewing court may not "substitute its judgment for that of the agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but must instead uphold the agency's action if it is "rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

**ARGUMENT**

## I. Novartis Has No Likelihood of Success on the Merits.

Novartis challenges both the Use Carve Out and the Dosage Carve Out. *First*, it argues that the Use Carve Out is not permitted by the "different manufacturer" exception to the FDCA's "same labeling" requirement for generic drugs approved under an ANDA. *See* ECF No. 3-1 at 14-21 ("Novartis TRO Mem."). *Second*, Novartis argues that FDA arbitrarily and capriciously determined that the Dosage Carve Out would not make MSN's product less safe and effective than Entresto®. *See id.* at 21-25. Novartis has no likelihood of success on either claim.

### A. The Use Carve Out Lawfully Omits a Patent-Protected Use by Adding Language Which Excludes It.

FDA's approval of the Use Carve Out is a straightforward application of the FDCA and FDA regulations—one that has long been upheld by the D.C. Circuit. *See Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499-1500 (D.C. Cir. 1996).[4] FDA regulations explicitly provide that under the "different manufacturer" exception, the agency may approve an ANDA based on labeling that differs from the reference drug's because it "omi[ts] an indication or other aspect of labeling protected by patent." 21 C.F.R. § 314.94(a)(8)(iv); *see also* 21 C.F.R. § 314.127(a)(7) (FDA may approve an ANDA with labeling differences "required . . . because aspects of the [reference] drug's labeling are protected by patent").

The approved Entresto® adult indication is protected by the Use Patents to the extent that it includes the drug's use in some patients with *normal* ejection fraction. *See* Entresto® Package Insert, ECF No. 1-1 at § 1.1 ("ENTRESTO is indicated . . . in adult patients with chronic heart failure. Benefits are most clearly evident in patients with [LVEF] below normal."); *see also* FDA 2024 Citizen Petition Response, ECF No. 1-8 at 32

---

[4] Novartis's reliance on *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 614 (2011), is misplaced. *See* Novartis TRO Mem. at 16. Although *Mensing* recognized the general rule that generic labeling must be the same as the brand labeling, 564 U.S. at 612–13, it does not address the exception to that rule for changes due to patent protection.

(explaining that this indication statement "includes patients who could be categorized within prevailing definitions" of heart failure with preserved ejection fraction). MSN's approved labeling omits that protected portion of the Entresto® indication statement by specifying that MSN's product is used only in patients with *reduced* ejection fraction. *See* MSN Package Insert at § 1.1 (Defs. Opp. Ex. A) ("Sacubitril and valsartan tablets are indicated . . . in adult patients with chronic heart failure and reduced ejection fraction."). An indication statement limited to patients with reduced ejection fraction omits Entresto®'s patent-protected use in some patients with normal ejection fraction. So on its face, the Use Carve Out falls within the "different manufacturer" exception to the "same labeling" requirement.

Novartis argues that FDA's approval of the Use Carve Out was nevertheless unlawful for five reasons. None of those arguments have any likelihood of success.

*First*, Novartis asserts that MSN's ANDA violates the FDCA and FDA regulations because it carves out Entresto®'s patent-protected use in some patients with normal ejection fraction by "adding [a] new" reference to reduced ejection fraction—rather than by "merely omitting language" from the Entresto® indication statement. Novartis TRO Mem. at 18-20. That argument fails because the plain text of the FDCA allows FDA to approve "changes required . . . because the [generic] drug and the [reference] drug are produced or distributed by different manufacturers," with no proviso that those changes may only be accomplished by deleting language. 21 U.S.C. § 355(j)(2)(A)(v). Furthermore, the FDA regulation in question allows FDA to approve the "omission of an *indication or other aspect of labeling*," not omission of *particular words*. 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).

That is precisely what FDA did here. Entresto® was originally indicated for treating chronic heart failure in patients with reduced ejection fraction. Novartis subsequently broadened the indication statement to include a patent-protected use in some patients with normal ejection fraction. In approving MSN's ANDA, FDA allowed

MSN to modify the Entresto® labeling to omit the patent-protected use and retain the non-protected uses, just as the agency's regulations permit. FDA precedent further confirms that Novartis's position is simply not the law. *See* FDA 2024 Citizen Petition Response, ECF No. 1-8 at 35-36 (agency may approve labeling that restricts scope of indication by adding words), at 37-38 (agency may approve labeling that carves out patent-protected subset of indicated use even if original indication statement did not explicitly describe subset(s)).

The fact that Novartis's position lacks any textual grounding is reason enough to reject it, but not the only one. Novartis's argument—that a generic manufacturer may only omit a patent-protected use by deleting words rather than adding them—puts form over substance and leads to absurd results. A necessary implication of Novartis's position is that the approvability of an ANDA with carved-out labeling would depend on essentially stylistic wording choices in the reference labeling—for example, the choice to draft a concise indication statement rather than one which lists every possible subgroup of patients a subsequent ANDA applicant may seek to omit. But this is not the question posed by the text of either the FDCA or FDA's regulations, which ask whether a labeling change is required because the generic and reference drugs are made by different manufacturers, including whether that difference requires omission of a patent-protected indication or other aspect of labeling. *See* 21 U.S.C. § 355(j)(2)(A)(v); 21 C.F.R. § 314.94(a)(8)(iv).

*Second*, Novartis asserts that because the Entresto® labeling has "just one indication statement," the Use Carve Out amounts to "rewriting" an indication rather than "omitting" one. Novartis TRO Mem. at 20. Novartis's argument is beside the point because neither the FDCA nor its implementing regulations state that FDA is limited to approving the omission of an "indication." The statute refers broadly to labeling "changes,"21 U.S.C. § 355(j)(2)(A)(v), and FDA's regulations expressly permit changes made to omit "an indication *or other aspect of labeling protected by patent*," 21 C.F.R.

§ 314.94(a)(8)(iv) (emphasis added). The Use Carve Out changes Entresto®'s indication statement to omit its instruction that the drug may be used in at least some patients with normal ejection fraction. Whether that method of use is an "indication" or not is irrelevant—at the very least, it is an "aspect of labeling protected by patent" that may lawfully be omitted from MSN's labeling. *See id.*

*Third*, Novartis argues that FDA misapplied the "same labeling" requirement by approving a package insert that in certain respects "reverts to the original" Entresto® labeling by carving out an approved use (in some patients with normal ejection fraction) that was added after Entresto®'s initial approval in 2015. Novartis TRO Mem. at 16-18. Novartis is flatly incorrect to assert that FDA relied on an earlier version of Entresto® labeling as "the basis" for assessing whether MSN's ANDA satisfied the "same labeling" requirement. *See id.* Rather, it approved labeling for MSN's generic product that is the same as the current Entresto® labeling except for certain discrete changes that use the current labeling as a baseline and are "in accordance with the statutory and regulatory provisions . . . permitting an ANDA applicant to omit an indication or other aspect of labeling protected by patent." *See* FDA 2024 Citizen Petition Response, ECF No. 1-8 at 37-38. Novartis does not identify any statutory or regulatory basis to prevent FDA from approving an ANDA with otherwise-lawful labeling changes merely because "the labeling as modified resembles a prior indication statement" for the reference drug. *See id.*

*Fourth*, Novartis argues that even if FDA followed its own regulations in approving the Use Carve Out, doing so exceeded the statutory scope of the "different manufacturer" exception to the FDCA's "same labeling" requirement. Novartis TRO Mem. at 18-19. In Novartis's view, the "'different manufacturer' exception would permit differences in generic labeling [only] to identify a different manufacturer, product name, or company address," and does not allow FDA to "carve out any indications at all." *Id.* at 19 (discussing 21 U.S.C. § 355(j)(2)(A)(v)).

The D.C. Circuit rejected Novartis's argument nearly thirty years ago in *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493 (D.C. Cir. 1996), when it held that the "different manufacturer" exception "permits [FDA] to approve an ANDA . . . even though the label of the generic product will not include one or more indications that appear on the label of the [reference] drug upon which the ANDA is based." *Bristol-Myers Squibb*, 91 F.3d at 1499-1500. After reviewing in detail the text, structure, and legislative history of the relevant FDCA provisions, the D.C. Circuit agreed with FDA that the agency may approve an ANDA which carves out a patented indication. *Id.* at 1500; *see also Caraco Pharm.*, 566 U.S. at 406 (explaining that a section viii statement allows a generic company to carve out a patent-protected use). *Bristol-Myers Squibb* is directly on point and this Court is bound to apply it.[5]

*Fifth*, Novartis claims that in approving the Use Carve Out, FDA arbitrarily and capriciously adopted a "strictly quantitative approach" under which sacubitril and valsartan are indicated based on "specific, quantified ejection fraction metrics." Novartis TRO Mem. at 20-21. That is incorrect.

Novartis's argument rests on its assertion that "reduced ejection fraction" is synonymous with "LVEF of less than or equal to 40%," *see id.* at 6, but no such numeric cutoff appears in MSN's approved labeling (or has ever appeared in any version of Entresto®'s labeling). Nor has FDA ever defined "reduced ejection fraction" to refer only to patients with LVEF less than or equal to 40%. *See generally* FDA 2024 Citizen

---

[5] The Supreme Court's recent decision to overturn the *Chevron* doctrine, *see Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), does not undermine *Bristol-Myers Squibb* for two reasons. First and most fundamentally, the D.C. Circuit in *Bristol-Myers Squibb* did not *defer* to FDA's statutory interpretation. It *agreed* with the agency's view at the first step of the now-overruled *Chevron* analysis—holding based on its own independent assessment of the statute that "Congress ha[d] directly addressed the issue . . . in dispute." *Bristol-Myers Squibb*, 91 F.3d at 1499-1500. Second, even if the holding of *Bristol-Myers Squibb* had been based on deference to an agency interpretation under *Chevron*, the Supreme Court has made clear that "prior cases that relied on the *Chevron* framework" to hold "that specific agency actions are lawful" are "still subject to statutory *stare decisis* despite [*Loper Bright's*] change in interpretive methodology." *Loper Bright*, 144 S. Ct. 2244 at 2273.

Petition Response, ECF No. 1-8 at 11-12, 28. FDA has explained that the term simply "reflects the clinical setting of impaired contraction supported by LVEF data below normal," and that the term's inclusion in the original Entresto® labeling "did not restrict the [drug] . . . strictly to patients with LVEF less than or equal to 40 percent." *Id.* at 26-27; *see also id.* at 11-13. Whether or not it would be arbitrary and capricious to approve a heart failure treatment indicated by a numerical LVEF cutoff is irrelevant because FDA did no such thing.

### B. FDA Reasonably Determined That the Dosage Carve Out Would Not Compromise Safety or Effectiveness.

FDA's approval of the Dosage Carve Out was not arbitrary or capricious because the agency has provided a reasoned scientific basis for concluding that it will not render MSN's generic product less safe and effective for its remaining conditions of use. *See generally* 21 C.F.R. § 314.127(a)(7). That "scientific judgment within [FDA's] area of expertise" is entitled to a "high level of deference" from this Court, *Rempfer v. Sharfstein*, 583 F.3d 860, 897 (D.C. Cir. 2009) (quotations omitted), and Novartis has shown no likelihood that it will succeed in demonstrating otherwise.

The primary basis for FDA's judgment is that the "WARNINGS AND PRECAUTIONS section ([S]ection 5) of [the MSN] labeling are sufficient to mitigate the risk of [sacubitril and valsartan]'s important adverse reactions." FDA 2024 Citizen Petition Response, ECF No. 1-8 at 39. That means that "[e]ven without the protected [S]ection 2.6 modified dosing regimen . . . , subsections 5.3 ([low blood pressure]), 5.4 ([kidney impairment]), and 5.5 ([excess blood potassium]), describe[] sufficiently how health care providers can manage intolerability or adverse reactions for all patients initiating and up-titrating on [sacubitril and valsartan]. Indeed, these labeling sections describe sufficiently the need to use lower doses . . . to mitigate th[ese] risks . . . ." *Id.* at 41. Particularly where "published guidelines on [heart failure] treatment" have long advised clinicians to use "a general up-titration approach guided by tolerability" and

have not specified the patients addressed by Section 2.6 "as an at-risk group," FDA concluded that "health care practitioners are in the best position to determine an appropriate initial dose of [sacubitril and valsartan] using the information contained in [MSN's] labeling, including [S]ection 5." *Id.* at 41-42. Novartis offers two responses, but neither has any likelihood of success on the merits.

*First*, Novartis points to the TITRATION study which supported the inclusion of Section 2.6 in the Entresto® package insert. *See generally* Novartis TRO Mem. at 23-25; *see also supra* at 6-8 (discussing TITRATION). Novartis argues that TITRATION establishes that Section 2.6 is "critical safety information," *id.* at 21, because its modified dosing regimen is the "safest and best-tolerated option" for patients not previously taking, or taking only a low dose of, an ACE inhibitor or ARB, *id.* at 24. That is incorrect because notwithstanding the TITRATION results, "[w]hether the [S]ection 2.6 dosing modification is the *safest* and *best-tolerated* option for such patients . . . is unknown." FDA 2024 Citizen Petition Response, ECF No. 1-8 at 40.

Novartis overstates TITRATION's significance. Since 2015, FDA has maintained that TITRATION at most suggests that some patients *might* benefit from the modified regimen that Section 2.6 describes. *Id.* at 16 & n.83, 40 & n.181. FDA's review of TITRATION determined that although it "provided some information about the safety profiles of the standard and modified dosing regimens[,] . . . [TITRATION's results] are not robust," and "do[] not provide a scientific basis to conclude . . . that the standard Entresto® dosing regimen puts [the relevant group of] patients at a greater risk of adverse reactions or that [S]ection 2.6 is 'critical' to ensuring . . . safe and effective use." *Id.* at 40-41. That is enough to conclude that the regimen Novartis proposed is "*reasonable*," *id.* 16 & n.83 (emphasis added)—but not to show that it is *required.*

*Second*, Novartis misunderstands FDA's basis for determining that other portions of the MSN labeling are adequate to ensure safety and efficacy following the Dosage Carve Out. FDA has determined based on its expertise that "health practitioners are in

the best position to determine an appropriate *initial* dose" of MSN's product. *See* FDA 2024 Citizen Petition Response, ECF No. 1-8 at 41 (emphasis added). In prescribing MSN's product for its remaining non-protected uses, healthcare providers will be able to consider not only the information contained in Section 5 of the MSN package insert, but also "published guidelines on [heart failure] treatment" that "support[] a general up-titration approach guided by tolerability," as well as their own clinical experience. *Id.* To be sure, some of the language in Section 5 refers to dosage modification after an adverse reaction has already occurred, but FDA is not relying on that language taken in isolation. The agency's consideration of published treatment guidelines and the experienced judgment of individual prescribers is a facially reasonable application of FDA's scientific expertise, and there is no likelihood that Novartis will succeed in arguing that the agency's decision was arbitrary and capricious.

## II. Novartis's Allegations of Purely Economic Injury Do Not Establish Irreparable Harm.

Novartis's motion should also be denied for failure to meet the D.C. Circuit's "high standard for irreparable injury." *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Failure to show irreparable harm is an independent ground for denying interim injunctive relief "even if the other three factors . . . merit [it]." *Id.*

At the outset, the core of Novartis's alleged injuries—whether framed in terms of revenue loss, loss of market position in general, exposure to generic competition in particular, or potential shrinkage of the Entresto® business unit in response to lowered demand—is a claim that Novartis will make less money from Entresto® if and when MSN enters the market. But "[i]n the D.C. Circuit, mere economic loss does not, in and of itself, constitute irreparable harm. Monetary loss, even irretrievable monetary loss, may constitute irreparable harm only if it is so severe as to cause extreme hardship to the business or threaten its very existence." *Mylan Lab'ys Ltd. v. FDA*, 910 F. Supp. 2d

299, 313 (D.D.C. 2012) (quotations omitted); *see also Watson Lab'ys, Inc. v. Sebelius*, 2012 WL 13076147, at \*3 (D.D.C. Oct. 23, 2012) ("[E]ven unrecoverable economic losses do not constitute irreparable harm . . . if they do not spell financial disaster for the moving party"); *Wisc. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ("Mere injuries, however substantial, in terms of money, time and energy . . . are not enough.") (quotations omitted).

Novartis has not shown that the losses it fears would so *immediately* threaten the *very existence* of its business as to merit a temporary restraining order issued on an extraordinarily compressed timeline. Novartis is one of the largest pharmaceutical firms in the world. Last year, its annual global sales revenue of approximately $45 billion generated about $8.5 billion in profit. *See* Novartis AG FY2023 Annual Report at 43 (Jan. 31, 2024), https://perma.cc/G6RP-3LDY. Approximately $3 billion of Novartis's annual revenue is from sales of Entresto® in the United States. *Id.* at 46. Novartis asserts that 80% of those sales—$2.4 billion—would be lost within six months of MSN's entry into the market. Declaration of Kristin Miller, ECF No. 3-2 at ¶ 24. Novartis's worst-case near-term loss, in other words, would amount to only 5.3% of its $45 billion in annual sales revenue. That is not nearly enough to establish irreparable harm. *See, e.g.*, *Varicon Int'l v. Office of Personnel Mgmt.*, 934 F. Supp. 440, 447-48 (D.D.C. 1996) (no irreparable harm from loss of contract representing 10% of plaintiff's revenue); *TGS Tech., Inc. v. Dept. of Air Force*, 1992 WL 19058, at \*3-4 (D.D.C. Jan. 14, 1992) (no irreparable harm from loss of contract constituting 20% of plaintiff's business); *Arrow Air, Inc. v. United States*, 649 F. Supp. 993, 995 (D.D.C. 1986) (no irreparable harm from loss of contract representing 25% of plaintiff's revenue). Novartis "will undoubtably survive as a going business concern absent injunctive relief." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 220-21 (D.D.C. 1996).

Importantly, it makes no difference to the above analysis that FDA enjoys sovereign immunity from suit for money damages. *Cf.* Novartis TRO Mem. at 27. As

one of Novartis's own authorities explains, alleged damages "do not become *per se* irreparable" because they are barred by sovereign immunity. *Xiaomi Corp. v. Dept. of Defense*, 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021). "To hold otherwise would essentially eviscerate the irreparable harm requirement for any cases brought against the government." *Id.*

Novartis's three other theories of irreparable harm are as unavailing as its claim of purely economic injury:

*First*, Novartis vaguely suggests that a reduction in revenue from Entresto® might constrain its ability to invest in the research and development on which its future as a company depends. *See* Miller Declaration, ECF No. 3-2 at ¶¶ 33, 37. Notably, Novartis does not assert that if MSN enters the market Novartis would *actually* reduce its research expenditures. Rather, it alleges only that they would be "jeopardized." *Id.* But there is no reason at all to credit that claim. Novartis makes about $8.5 billion in profit per year. *See* Novartis AG FY2023 Annual Report at 43. So even if 100% of the $2.4 billion in Entresto® sales that Novartis expects to lose would otherwise have been spent directly on research, the company could replace those losses dollar-for-dollar from other revenue streams and still have more than $6 billion in profit to spare. Novartis's ability to fund its research efforts plainly does not depend on its ability to maintain its current level of Entresto® sales.

*Second*, Novartis speculates that if a generic version of Entresto® is approved (and particularly a generic version with carved-out labeling), consumers and prescribers might confuse the generic with Entresto® itself and damage the reputation of Novartis's product. *See* Miller Declaration, ECF No. 3-2 at ¶¶ 34, 39-41. Courts in this district have repeatedly rejected essentially indistinguishable conjecture as a basis for injunctive relief. *See, e.g.*, Prelim. Inj. Mot. Hr'g Tr., ECF No. 36 at 39:11-40:6, *Vanda Pharms., Inc. v. FDA*, No. 1:23-cv-280-TSC (D.D.C. Mar. 6, 2023) (Defs. Opp. Ex. C) ("For Vanda to suffer meaningful reputational harm, a significant portion of patients would

have to . . . One, switch [to the generic] . . . ; two, make a mistake in using [the generic] as a result of [labeling differences]; three, suffer harm as a result; and four, irrationally blame that harm on Vanda rather than [the generic manufacturer].”); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 164-65 (D.D.C. 2006) (rejecting speculation that the “negative impact” of adverse reactions to a new generic product “will inevitably reach [the brand] as well”); *Astellas Pharma US, Inc. v. FDA*, 642 F. Supp. 2d 10, 23 (D.D.C. 2009) (rejecting speculation that brand-name firm “will suffer a loss of goodwill and reputation . . . to the extent that the generic product fails to provide the safe and effective treatment that physicians have come to expect from [the brand-name drug]”).

*Third*, Novartis argues that it faces irreparable harm from the loss of “statutory rights of patent and market exclusivity.” Novartis TRO Mem. at 26. But Novartis may not claim irreparable harm from the loss of rights it is not actually suing to enforce. Novartis claims in its complaint that FDA unlawfully approved the labeling changes proposed in MSN’s ANDA. It does not, by contrast, claim that the agency denied Novartis any statutory market exclusivity or infringed the company’s patent rights. Nor could it. Novartis has already enjoyed a full period of regulatory exclusivity for which it was qualified, *see* FDA 2024 Citizen Petition Response, ECF No. 1-8 at 6, 23, and is already seeking to vindicate its patent rights in the appropriate forum—an infringement suit against MSN rather than APA litigation against FDA, *see generally Novartis Pharms. Corp. v. MSN Pharms. Inc., et al.*, No. 1:22-cv-1395 (D. Del.).

### III. Neither the Balance of Harms Nor the Public Interest Favor an Injunction.

Denying an injunction will not cause Novartis any irreparable injury. As discussed in detail above, FDA acted lawfully in approving MSN’s ANDA, and Novartis will not suffer more than ordinary economic loss if and when MSN enters the market. Novartis has no legitimate interest either in enjoining lawful agency action or in avoiding competitive pressure from a lawfully approved generic drug.

By contrast, granting an injunction would inflict tremendous harm on the public at large and MSN. Where, as here, FDA followed the law in approving MSN's ANDA and found it to meet all applicable approval standards, there is a clear "public interest in receiving generic competition to brand-name drugs as soon as possible." *Astellas Pharma*, 642 F. Supp. 2d at 23-24 (quotation omitted). There is no legitimate contrary interest on which an injunction could rest. Simply put, "[t]he public interest factor is inextricably linked with the merits of [Novartis's] claim and, accordingly, provides [it] no support." *Id.* at 23 (citing *Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998)). An injunction would also deprive MSN of its ability under the FDCA to market its approved generic drug. The balance of harms and public interest factors tip decisively against injunctive relief.

## CONCLUSION

For these reasons, the Court should deny Novartis's motion for a temporary restraining order or preliminary injunction.

August 6, 2024                                    Respectfully submitted,

                                                 */s/ Gabriel I. Schonfeld*
                                                 GABRIEL I. SCHONFELD
                                                 (D.C. Bar. No. 155539)
                                                 Trial Attorney
                                                 Consumer Protection Branch
                                                 Civil Division
                                                 U.S. Department of Justice
                                                 PO Box 386
                                                 Washington, DC 20044-0386
                                                 (202) 353-1531
                                                 (202) 514-8742 (fax)
                                                 Gabriel.I.Schonfeld@usdoj.gov