# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>*Plaintiff*,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*,<br><br>and<br><br>MSN PHARMACEUTICALS, INC., *et al.*,<br><br>*Intervenor-Defendants*. | Civil Action No. 1:24-cv-02234-DLF |

### REPLY IN SUPPORT OF
### NOVARTIS'S MOTION FOR TEMPORARY RESTRAINING ORDER
### AND/OR PRELIMINARY INJUNCTION

Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
Marlan Golden (D.C. Bar. No. 1673073)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Tel:  (202) 637-5600
cate.stetson@hoganlovells.com

Dated: August 7, 2024

*Attorneys for Plaintiff Novartis Pharmaceuticals Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................2

    I.   NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS ............................................2

        A.   FDA Unlawfully Added New Language To The Generic Labeling ..............2

            1.   *The Generic Labeling Violates The FDCA By Reverting To A Superseded ENTRESTO Indication* ............................................2

            2.   *FDA ACTED UNLAWFULLY BY ADDING LANGUAGE TO THE MSN INDICATION* ......................................................... 6

        B.   FDA Unlawfully Carved Out Critical Safety Instructions.............................9

    II.  NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF ......................................................................................11

    III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR GRANTING A TRO ..................................................................................................13

CONCLUSION ......................................................................................................................14

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) .................................................................................. 8

*AstraZeneca Pharms. LP v. FDA*,
  872 F. Supp. 2d 60 (D.D.C. 2012) ............................................................................. 2

*Biovail Corp. v. FDA*,
  519 F. Supp. 2d 39 (D.D.C. 2007) ............................................................................. 6

*Bristol-Myers Squibb Co. v. Shalala*,
  91 F.3d 1493 (D.C. Cir. 1996) .................................................................................. 4

*Citizens for Resp. & Ethics in Washington v. FEC*,
  904 F.3d 1014 (D.C. Cir. 2018) ................................................................................ 5

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017) ...................................................................................... 8

*Gozlon-Peretz v. United States*,
  498 U.S. 395 (1991) .................................................................................................. 5

*Hill Dermaceuticals, Inc. v. FDA*,
  709 F.3d 44 (D.C. Cir. 2013) .................................................................................. 13

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ............................................................................................. 6, 7

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) .............................................................................................. 5

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011) .................................................................................................. 3

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) .................................................................................................. 4

*Sigma-Tau Pharms., Inc. v. Schwetz*,
  288 F.3d 141 (4th Cir. 2002) ................................................................................ 4, 5

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*,
  211 F.3d 21 (2d Cir. 2000) ....................................................................................... 6

*U.S. Int'l Trade Comm'n v. ASAT, Inc.*,
  411 F.3d 245 (D.C. Cir. 2005) .................................................................................. 6

*Univ. of Great Falls v. N.L.R.B.*,
  278 F.3d 1335 (D.C. Cir. 2002) .............................................................................. 11

**Statutes:**

21 U.S.C. § 355(a)(o)(2) .................................................................................................... 5

21 U.S.C. § 355(d) .................................................................................................................. 10

21 U.S.C. § 355(j)(2)(A)(v) ............................................................................................... 2, 4, 7

**Rules and Regulations:**

21 C.F.R. § 314.94(a)(8)(iv) .................................................................. 2, 3, 4, 6, 9, 10, 11

21 C.F.R. § 314.127(a)(7) ............................................................................................... 2, 10, 11

54 Fed. Reg. 28,872, 28,881 (July 10, 1989) ............................................................................ 7, 11

54 Fed. Reg. 28,872, 28,884 (July 10, 1989) ................................................................................... 6

57 Fed. Reg. 17,950, 17,957 (Apr. 28, 1992) ................................................................................... 3

57 Fed. Reg. 17,950, 17,959 (Apr. 28, 1992) ................................................................................... 3

**Other Authorities:**

H.R. Rep. No. 98-857(I) (1984),
  *reprinted in* 1984 U.S.C.C.A.N. 2654 ....................................................................................... 4

OMISSION, Black's Law Dictionary (11th ed. 2019) ........................................................................ 6

## INTRODUCTION

In approving MSN's product, FDA went well beyond its statutory authority. Despite the requirement that generic drugs must share the same labeling as their reference drug product, FDA did not just "carve out" aspects of ENTRESTO's labeling, but completely rewrote critical aspects of the product's indication, conditions of use, and dosing instructions. This violated the careful balancing by Congress to incentivize the development of new therapies and control drug costs, while also ensuring that generic drugs are as safe and effective as the brand-name products on which they are based. MSN's product approval should not stand based on this altered labeling.

In its response brief, FDA has said conspicuously little about the textual basis for its actions, instead relying only on the expanded authority to effectuate labeling carve-outs that it purported to grant itself through regulation. And neither FDA nor MSN have adequately rebutted the strong evidence Novartis has put forward on irreparable harm. That is unsurprising, as Novartis stands to lose a great deal—to its reputation, goodwill, key relationships, market position, research and development capabilities, human capital—if a purported generic referencing its most successful product launches now and in violation of clear statutes and its regulatory rights.

Because the agency's approval of the MSN product violates its governing statute and binding regulations, Novartis asks the Court to enter a temporary restraining order preserving the status quo, direct FDA to produce the administrative record in short order, and set this case for a preliminary injunction hearing.

**ARGUMENT**

**I.   NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS**

    **A.  FDA Unlawfully Approved A Product With A Different Approved Indication Than ENTRESTO.**

On its current labeling, ENTRESTO is indicated for all patients with heart failure, regardless of their ejection fraction. ECF No. 1-1 (Ex. A § 1.1). Yet FDA approved MSN's product with labeling that rewrites the approved indication to cover only patients with *reduced* ejection fraction. That action violates FDA's governing statute and binding rules requiring that the labeling of a generic product match that of an innovator drug, subject to narrowly drawn exceptions not applicable here. 21 U.S.C. § 355(j)(2)(A)(v). FDA's arguments to the contrary gloss over the key provisions of the statutory and regulatory text.

    **1.  *The Generic Labeling Violates The FDCA By Reverting To A Superseded ENTRESTO Indication.***

Both the FDCA and its implementing regulations expressly require generic labeling to match the "labeling approved for the listed drug." 21 U.S.C. § 355(j)(2)(A)(v); 21 C.F.R. § 314.127(a)(7); 21 C.F.R. § 314.94(a)(8)(iv). That clearly means the *current* labeling. FDA has acknowledged as much; in its response to a citizen petition regarding Fanapt (iloperidone), the agency explained that in assessing labeling carve-outs, the agency must "start with the currently approved labeling" and that "*earlier versions of the drug's labeling . . . have no relevance to this inquiry*." Ex. B (Fanapt Petition Response) at 9 (footnote omitted). And FDA has recognized that after the agency expands an indication statement through a new sNDA approval, the drug's prior labeling has been superseded. *Cf. AstraZeneca Pharms. LP v. FDA*, 872 F. Supp. 2d 60, 81 n.16 (D.D.C. 2012) (sNDA approval letter "stated that previous labeling supplements have been superseded by this approval action") (internal quotation marks omitted).

2

MSN's labeling does not reflect ENTRESTO's current label. In 2021, FDA approved revised labeling for ENTRESTO that moved beyond a dichotomous classification of heart failure based on a traditional left ventricular ejection fraction (LVEF) cut-off. ECF No. 1-1 (Ex. A § 1.1). Yet when the agency approved MSN's product, it pretended as if nothing had changed in the intervening five years, clearing the way for MSN to launch a product that matches Novartis's labeling as it existed in 2019 instead of its labeling in 2024.

That action was contrary to the plain text of regulations that bind the agency. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 613 (2011) ("FDA, however, tells us that it interprets its regulations to require that the warning labels of a brand-name drug and its generic copy must *always* be the same—thus, generic drug manufacturers have an ongoing federal duty of 'sameness.' " (emphasis added) (citing 57 Fed. Reg. 17,950, 17,959 (Apr. 28, 1992)).[1] This conclusion is further evidenced by the very regulatory text that FDA hangs its hat on: The different-manufacturer exception allows "labeling revisions made to comply with *current* FDA labeling guidelines or other guidance[.]" 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).

This is not a situation where indication A plus indication B equals indication C, as Defendants argue in their briefs. MSN Opp. 8; Gov't Opp. 15. This is a situation where indication A (premised on an LVEF framework) was replaced with indication D (which rejects the LVEF cut-off paradigm). The result: A generic label that does not match the current labeling of the drug it purports to reference.

---

[1] In support of this legal requirement, the Court in *PLIVA, Inc. v. Mensing*, 564 U.S. at 613, cited FDA's rulemaking acknowledging that "the labeling for an ANDA product must be the same as the labeling for the listed drug product *except for differences due to different manufacturers, exclusivity, etc.*" 57 Fed. Reg. at 17,961 (emphasis added). There is thus no reason to infer the *Mensing* majority was unaware of "the exception to that rule for changes due to patent protection." Gov't Opp. 13 n.4.

3

### 2.  *FDA Acted Unlawfully By Adding Language to the MSN Indication.*

The agency also violated the statute and its own regulations by adding new language to the MSN indication that does not appear in the ENTRESTO indication. The statute requires the labeling to be the "same," except as "required" to reflect that the drug is produced by a "different manufacturer." 21 U.S.C. § 355(j)(2)(v). The agency's regulations permit "*omission* of an indication" to address a marketing exclusivity or patent right. 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added). They do not permit a rewriting of the reference product's current approved indication.

To reach the conclusion that FDA's action survives scrutiny, the Government and MSN employ phrases like "essentially stylistic wording choices" and "minor attendant changes," Gov't Opp. 15; MSN Opp. 7. But these "wording choices" are neither "stylistic" nor "minor." They do not comport with the statute. The simplest way forward is to hew closely to the statutory and regulatory text. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).

Start with the statute, which demands "that the labeling proposed for the new drug is the same as the labeling approved for the listed drug"—unless the reason for those differences is that the two products are "produced or distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). It is true that the D.C. Circuit has previously accepted the Government's argument that this language "permit[s] an ANDA to be approved for less than all of the indications for which the listed drug has been approved." *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1500 (D.C. Cir. 1996) (quoting H.R. Rep. No. 98-857(I) (1984), *reprinted in* 1984 U.S.C.C.A.N. 2654–55)); *see also* MSN Opp. 8–9 (citing *Sigma-Tau Pharms., Inc. v. Schwetz*, 288 F.3d 141 (4th Cir. 2002)). But that case was decided under the outdated *Chevron* rubric, which has now been overturned. Indeed, the Court noted that "BMS rests its case squarely upon the first step in

4

[*Chevron*]," and thus framed the question presented as whether "the statute clearly *precludes* such approval." *Id.* While the Court answered that question in the negative, that does not mean that the agency's interpretation is the *best* reading of the statute, post-*Loper Bright*. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

In any event, *Bristol-Myers Squibb* does not answer the question this case asks: whether FDA may rewrite an indication or other aspect of labeling protected by patent, rather than simply remove one of several indications from generic labeling. Under a plain reading of the statute, the answer is no. When approving an ANDA, the agency lacks the statutory authority to redline *within* the innovator drug's approved indication or other aspect of labeling rather than merely omit a separate indication, as the agency did in approving MSN's product.

Context further confirms that FDA's power is statutorily bounded. Congress expressly granted FDA the authority to *add* language to an ANDA product's labeling when omitting a protected *pediatric* use. *See* 21 U.S.C. § 355a(o)(2). The fact that Congress specifically permitted the agency to add language to generic labeling for pediatric uses—and the absence of any corresponding "add" provision for non-pediatric uses—confirms that FDA does not possess the statutory authority to add wording to MSN's generic to ensure the omission of protected uses. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). To conclude otherwise would elevate the skinny-labeling policy goals the opposition heralds over the actual same-labeling statute Congress enacted. *See Citizens for Resp. & Ethics in Washington v. FEC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018).

The FDCA's implementing regulations, to the extent they come into play here, allow only "limited" exceptions to the statute's same-labeling requirement. 54 Fed. Reg. 28,872, 28,884 (July 10, 1989). The Government claims the regulation's reference to "omission of an indication or other aspect of labeling protected by patent" gives the agency license to omit a "method of use" rather than "omission of particular words." Gov't Opp. 14, 16 (citing 21 C.F.R. § 314.94(a)(8)(iv)).[2] That position bends the regulatory text beyond its breaking point. FDA spoke plainly when it spelled out what the regulation allows: Only an omission "of an indication" or other patent-protected "aspect of labeling" may be carved out. 21 C.F.R. § 314.94(a)(8)(iv); *see also Biovail Corp. v. FDA*, 519 F. Supp. 2d 39, 48 (D.D.C. 2007) ("[T]he plain language of the Hatch–Waxman Amendments, their legislative history, and their interpretation by the FDA all require manufacturers of generic drugs to copy the labeling manufacturers of generic drugs to copy the labeling of pioneer drugs 'near-verbatim' to obtain ANDA approval.") (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 27 (2d Cir. 2000)). The agency could have chosen any number of ways to draft its regulation. Its use of "omission" carries a particular meaning. OMISSION, Black's Law Dictionary (11th ed. 2019) ("The state of having been left out or of not having been done" or "Something that is left out, left undone, or otherwise neglected").

The regulation must be applied as it is written, not as the agency wishes it read. *See U.S. International Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 253 (D.C. Cir. 2005) ("The Commission is bound by its regulations."). And FDA does not ask for deference to its reformulated read of the

---

[2] MSN, for its part, argues that the list of permissible labeling differences identified in 21 C.F.R. § 314.94(a)(8)(iv) are merely *examples*, and that FDA may generate other, unarticulated reasons to dispense with the ordinary requirement that a generic product's labeling match that of its reference listed drug. MSN Opp. 7. The Government apparently, and correctly, does not agree.

6

regulation, which makes sense given that "the character and context of the agency interpretation" entitle it to none. *Kisor v. Wilkie*, 588 U.S. 558, 576, 579 (2019) (a court does not defer to an "ad hoc" interpretation of a regulation or "a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties").

Instead, the Government complains that by interpreting "omission" to exclude "addition," Novartis is elevating "form over substance." Gov't Opp. 15. But under the same-labeling requirement, the form of a drug label *is* its substance: "Consistent labeling for duplicate versions of a drug product, insofar as this is possible, will avoid differences that might confuse health care professionals who prescribe and dispense prescription drug products or might create omissions of significant information." 54 Fed. Reg. at 28,881. MSN's labeling creates the very problem that FDA's governing statute and regulations try to solve: inconsistent, confusing labeling.

And the agency's revision of the ENTRESTO indication creates another problem: It creates a condition of use for the MSN product that was not previously approved for ENTRESTO. 21 U.S.C. § 355(j)(2)(A)(i) ("An abbreviated application for a new drug shall contain information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a . . . listed drug"). The Government admits in its brief that the current ENTRESTO labeling encompasses "some patients with *normal* ejection fraction." Gov't Opp. 13. The Government then asserts that MSN carved these patients out of their labeling by adding language limiting the indication statement only to patients with *reduced* ejection fraction. *Id.* at 14. However, within the Indications and Usage section of the labeling, MSN included (and FDA unlawfully approved) an instruction on *usage* that was included in the labeling for Entresto only when the product was approved for the broad heart failure indication. ECF No. 13-1 § 1.1. The MSN labeling states, immediately after the supposed limiting

7

language, that measurement of ejection fraction is variable, so clinicians should use their clinical judgment in deciding whom to treat with the drug. *Id.* But when that exact same limiting language appeared in the original (now superseded) indication statement for Entresto, ***there was no statement instructing physicians to use clinical judgment rather than rely on measurement of LVEF***. ECF No. 1-9 (Ex. I) § 1.1.

The marriage of these two statements by MSN – *use only in patients with reduced ejection fraction* and *measurement of ejection fraction is variable, so use clinical judgment in deciding whom to treat* – was not previously approved for the reference product. This type of complete configuring of labeling language, by a generic drug sponsor, finds no basis in the FDCA or implementing regulations.

If FDA finds that faithfully applying its own regulation leads to "absurd results," Gov't Opp. 15, the agency has recourse: It may replace this regulation with a new one that better serves it ends. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (an agency "may not alter [a legislative rule] without notice and comment"). Unless and until the agency adopts a new regulation, however, the APA requires FDA to follow the same-labeling regulation it promulgated. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation."). The FDCA and regulations that implement the statute are "the law," not an earlier agency response to a citizen petition that went unchallenged and was ultimately never incorporated into an ANDA approval; the Government gets this hierarchy of authority exactly backwards. Gov't Opp. 15; ECF No. 1-6 at 23 (Ex. F). What's more, the sole agency adjudicative decision the Government and MSN cite in support merely combined two mutually exclusive patient populations. *See id.*; MSN Opp. 9–10 (citing Velcade

petition response). FDA's approval of new labeling for ENTRESTO, however, reflected fundamentally changed circumstances: The agency's understanding of the approved patient population, as well as the relevance of left ventricular ejection fraction (LVEF) as a diagnostic criterion, had evolved since the drug's original approval.

A temporal aspect might explain (but does not excuse) the agency's unlawful action here. MSN sought ANDA approval to market a generic sacubitril and valsartan product back in 2019. Gov't Opp. 10. At that time, LVEF served as the lodestar for the patient population identified in Novartis's ENTRESTO labeling. But that time lag does not excuse the agency's conduct here. The different-manufacturer exception allows "labeling revisions made to comply with *current* FDA labeling guidelines or other guidance[.]" 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).

### B. FDA Unlawfully Carved Out Critical Safety Instructions.

FDA also violated its own regulations by allowing the labeling of the MSN product to strike out critical safety instructions relating to a modified dosing regimen that FDA approved for ENTRESTO. As Novartis explained in its opening brief, this modified dosing regimen, found in Section 2.6 of ENTRESTO's labeling, is derived from the results of Novartis's TITRATION study, which established that the modified dosing regimen results in fewer clinically relevant adverse events for this patient group and allowed a greater proportion of these patients to reach the efficacious target dose. Ex. A § 2.6; Ex. F at 24–26; Ex. H at 40.

In response, the agency suggests that Novartis "overstates TITRATION's significance" and that this regimen the agency reviewed and approved for ENTRESTO's labeling is "reasonable" but not "required." Gov't Opp. 19. Section 2.6 of ENTRESTO's labeling does not *recommend* the modified dosage regimen, it requires it. When FDA recommends modified dosing, the labeling will say "recommend" or "consider." *See* FDA Approved Labeling for Aldactone, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/012151s079lbl.pdf. ("In

9

patients with an eGFR between 30 and 50 mL/min/1.73 m2, *consider* initiating therapy at 25 mg every other day because of the risk of hyperkalemia [see Use in Specific Populations (8.6)]." (emphasis added).  In the ENTRESTO labeling, in contrast, the agency included the modified dosing regimen as a mandatory directive, not a recommendation.

FDA also doubles down on its newfangled test for permitting labeling carve-outs.  The governing regulations prohibit carve-outs if they would render the resulting labeling "less safe or effective than the listed drug for *all remaining, non-protected conditions of use*."  21 C.F.R. § 314.127(a)(7); 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).  In both its petition response and its opposition brief, the agency applies a new standard:  the agency now asserts that there is no need for such patients to receive the "safest and best-tolerated option."  Ex. H at 41; Gov't Opp. 14 (arguing that it is "unknown" whether the modified dosing regimen is the "safest and best-tolerated option").  If it is unknown whether the modified dosing regimen is safer, FDA has no reasonable basis for carving it out on the pretense that the labeling is equally safe without it.

So to review the bidding:  FDA (1) adopted labeling for Novartis that it found, based on clinical trial data showing risks to the intended patient population, was necessary to ensure the safety and efficacy of ENTRESTO, 21 U.S.C. § 355(d); (2) walked back that decision when approving the MSN product; and (3) now claims that healthcare providers are best equipped to determine safety or efficacy on their own.  This means a healthcare provider now must make more decisions with less information.  If FDA's actions stand, that labeling will not include the specific instructions found in Section 2.6 of the Novartis labeling—the specific guidance that allows healthcare providers to make patient-appropriate dosing decisions.

Without those critical instructions, adverse events are likely to increase.  The Government tacitly acknowledges as much, conceding that the only FDA-approved guidance left is "the

10

language in Section 5 [that] refers to dosage modification *after an adverse reaction has already occurred*." Gov't Opp. 20 (emphasis added). And while the Government says these professionals may consult treatment guidelines and their own independent judgment, leaving them at sea is hardly consistent with the same-labeling regulations' interest in "avoid[ing] differences that might confuse health care professionals who prescribe and dispense prescription drug products or might create omissions of significant information." 54 Fed. Reg. at 28,881*; see also* ECF No. 3-2 (Miller Decl. ¶ 40).

To be very clear: Novartis takes issue with FDA's abrupt change in the standards it applies for determining whether a generic product can omit safety instructions the agency has mandated that the branded product include. To decide that issue, the Court need not second-guess FDA or its scientific judgment. It need only determine whether in approving a generic drug with different safety instructions than ENTRESTO, FDA has strayed from the standard: If it is likely that omission of the TITRATION-derived safety instructions from the MSN product's labeling renders it "less safe or effective than the listed drug for all remaining, non-protected conditions of use," the answer is yes. 21 C.F.R. § 314.127(a)(7); 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added). That is not a question of science, and it is not an issue on which the agency is due any deference. *University of Great Falls v. N.L.R.B.*, 278 F.3d 1335, 1340 (D.C. Cir. 2002) ("The Board reached the wrong conclusion because it applied the wrong test . . . we give no deference to the NLRB's application of this exemption[.]"). For this independent reason as well, FDA's action violates the APA.

## II. NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF.

Unless it obtains judicial relief preserving the status quo ante, Novartis will suffer irreparable injury. The Government and MSN devote most of their briefing on this factor to state

11

an unremarkable point: Novartis is a large drug manufacturer. That is true enough; it is also beside the point. Financial injury by itself may not often warrant temporary injunctive relief, but Novartis has put forward evidence of injury that is *not* pecuniary and is by all accounts irremediable. *See, e.g.*, ECF No. 3 (Opening Br.) at 26–30; ECF No. 3-1 (Miller Decl.) ¶¶ 26–41. In response to Novartis's contentions and sworn declaration, the Government and MSN have very little to say. To review:

- Because physician and patient preferences shift quickly in the face of generic entry, Novartis would experience an irretrievable loss of ENTRESTO's market position even if the MSN product's approval is later enjoined. Miller Decl. ¶¶ 38, 39. The Government has no response to this, and MSN concedes it. *See* Gov't Opp. 20; MSN Opp. 17–19.

- Unlawful entry of the purported generic product also will cause confusion as well as mistaken attribution of adverse events and other side effects to ENTRESTO. This will undermine Novartis's standing with physicians and patients and jeopardize key relationships within the cardiovascular health space. *Id.* ¶ 39. The problem will be exacerbated given the troubling issues presented by this case: MSN's purported generic product will not have the same labeling and will omit critical safety instructions if it is permitted to launch. The Government calls this "conjecture," Gov't Opp. 22, and MSN ignores it.

- If MSN's improperly approved product is allowed to enter the market, Novartis also will be forced to make difficult decisions regarding staffing and employee retention. Because Novartis would be unable to continue employing all members of its team who currently support ENTRESTO, the company will have to engage in significant restructuring—which could not be undone, once implemented. Miller Decl. ¶ 30. The Government barely acknowledges this point, Gov't Opp. 20, and MSN concedes the point but claims Novartis has "exaggerated" the harm. MSN Opp. 19.

- Absent temporary relief, Novartis also will suffer additional reputational injury and permanent loss of goodwill as a result of the suspension of critical support programs that are collectively expected to assist more than 200,000 patients in 2024—programs that are only made possible by ENTRESTO's current success. Miller Decl. ¶ 35. Neither the Government nor MSN contest this point.

- A curtailing of research and development investment, including cutbacks to the more than 100 clinical-stage projects in Novartis's pipeline, would be an unavoidable consequence of unlawful generic entry. That harm, too, is irreparable. Miller Decl. ¶ 32. The Government speculates that this harm may not come to pass, Gov't Opp. 22, and MSN ignores it.

Neither is there any basis for believing the harm to Novartis may not be immediate. MSN has made repeated reference to its launch preparations in its intervention motion and opposition brief, and has announced that it will launch in the "near future." ECF No. 10 at 2. Once a generic launches, the cascade of harms that Novartis has outlined will begin—and there is no way to remedy those injuries after the fact, even if the MSN product's unlawful approval is later enjoined.

### III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR GRANTING A TRO.

Both the balance of equities and public interest factors tip in Novartis's favor. FDA faces no harm whatsoever from an order ensuring that unlawful agency action is not allowed to injure Novartis. And although MSN may feel the effects of an order granting preliminary relief, the harm to MSN—which has not yet launched its product and thus can only speculate as to the prospective injury it would suffer—does not outweigh the substantial harm Novartis faces.[3] There also is a compelling public interest in ensuring that FDA adheres to its governing statute and regulations.

MSN also suggests a more traditional summary-judgment briefing schedule, or a preliminary-injunction proceeding that takes several weeks to resolve. MSN Opp. 17. The equities and public interest factors favor granting a TRO here: As MSN admits, by the time either of those other procedural pathways had concluded, the new MSN product will have already launched. That is why requests for emergency relief "may sometimes be appropriate in APA cases where time is of the essence—for instance, where a party believes there is an immediate need to prevent a new drug from reaching the market." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 46 n.1 (D.C. Cir. 2013). This dispute presents as clear-cut a case as any for awarding temporary interim relief.

---

[3] MSN argues that it will suffer "drastic adverse impact" if its product cannot launch imminently while also claiming that in the converse scenario, Novartis will suffer minimal harm. MSN Opp. 22–23. This heads-I-win, tails-you-lose approach to balancing the equities is as curious as it is wrong.

## CONCLUSION

For the foregoing reasons, and those in Novartis's opening memorandum, Novartis's motion for a TRO and/or preliminary injunction should be granted.

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
Marlan Golden (D.C. Bar. No. 1673073)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5491
Facsimile: (202) 637-5910
cate.stetson@hoganlovells.com

Dated:  August 7, 2024                    *Attorneys for Novartis Pharmaceuticals Corporation*

14