**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> *Plaintiff*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, and <br><br> ROBERT M. CALIFF, M.D. in his official capacity as COMMISSIONER OF FOOD AND DRUGS, FOOD AND DRUG ADMINISTRATION, <br><br> *Defendants,* <br><br> and <br><br> MSN PHARMACEUTICALS INC. and MSN LABORATORIES PRIVATE LIMITED, <br><br> *Intervenor-Defendants.* | Case No.:  1:24:cv:02234-DLF <br><br> **UNDER SEAL** |

**MSN'S MEMORANDUM IN OPPOSITION TO
NOVARTIS'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF MSN'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .....................................................................................2

     I.     Statutory and Regulatory Background ...................................................2

     II.    Relevant Factual History ........................................................................4

LEGAL STANDARD .................................................................................................6

ARGUMENT .............................................................................................................8

I.     FDA'S APPROVAL OF MSN'S LABELING CARVE-OUT WAS RATIONAL
     AND WELL WITHIN ITS AUTHORITY .........................................................8

     A.    FDA's Approval Of MSN's Carved-Out Indication Is A Routine Exercise
          Of The Authority Granted To It By Statute And Intended By Congress.................8

     B.    FDA's Approval Of MSN's Indication Carve-Out Was Not Based On
          Discontinued Labeling ........................................................................11

     C.    Novartis Urges A Reading Of FDA's Regulations That Is Inconsistent
          With Their Plain Text .........................................................................13

     D.    Novartis's Novel Interpretation Of FDA's Regulations Runs Directly
          Contrary To The Congressional Intent Behind 21 U.S.C.
          § 355(j)(2)(A)(viii)...........................................................................15

II.    FDA'S FACTUAL DETERMINATIONS AS TO DRUG SAFETY AND
     EFFICACY ENJOY HIGH LEVELS OF RESPECT AND SHOULD NOT BE
     OVERTURNED .........................................................................................17

III.   THE COURT SHOULD NOT SECOND-GUESS FDA'S SCIENTIFIC
     DETERMINATION THAT MSN'S GENERIC DRUG HAS THE SAME
     ACTIVE INGREDIENTS AS ENTRESTO....................................................21

CONCLUSION.........................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L. Pharma, Inc. v. Shalala*,
  62 F.3d 1484 (D.C. Cir. 1995) ..................................................................................25

*A/S v. Lupin Ltd.*,
  87 F.4th 1361 (Fed. Cir. 2023) ..................................................................................16

*Actavis Laboratories, FL, Inc. v. U.S.*,
  161 Fed. Cl. 334 (2022) ..............................................................................................16

*In re Barr Labs, Inc.*,
  930 F.2d. 72 (D.C. Cir. 1991) .......................................................................................8

*Bristol-Myers Squibb Co. v. Shalala*,

  91 F.3d 1493 (D.C. Cir. 1996) ....................................................................................10

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399 (2012)........................................................................................................8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..............................................................................................2, 7, 10

*Ford Motor Co. v. United States*,
  908 F.3d 805 (Fed. Cir. 2018)......................................................................................15

*Friedman v. FAA*,
  890 F.3d 1092 (D.C. Cir. 2018) ....................................................................................21

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564, 102 S. Ct. 3245, 73 L.Ed.2d 973 (1982)............................................16

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024)....................................................................................7, 17, 21, 26

*Matthews v. Commissioner*,
  907 F.2d 1173 (D.C. Cir. 1990) ....................................................................................15

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................................................6

*Pharm. Mfg. Research Servs. v. FDA*,
  957 F.3d 254 (D.C. Cir. 2020) ..............................................................................6, 18, 21

98557331.1

*Schering Corp. v. FDA*,
   51 F.3d 390 (3d Cir.1995)......................................................................24

*Serono Labs, Inc v. Shalala*,
   158 F. 3d. 1313 (D.C. Cir. 1998).........................................................2, 25

*Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.*,
   785 F.3d 625 (Fed. Cir. 2015)..................................................................9

*Teva Pharm. Indus. v. Crawford*,
   410 F.3d 51 (D.C.Cir.2005)....................................................................16

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
   412 U.S. 609 (1973)...........................................................7, 17, 18, 21

*Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*,
   473 F.3d 1239 (D.C. Cir. 2007)..............................................................14

**Statutes**

5 U.S.C. § 706(2)(A).................................................................................6

21 U.S.C. §§ 355(b)(1), 355(j).....................................................................2

21 U.S.C. § 355(j)(2)..................................................................................2

21 U.S.C. § 355(j)(2)(A)(ii),(iii)...................................................................3

21 U.S.C. §355(j)(2)(A)(iv)..........................................................................8

*21 U.S.C. § 355(j)(2)(A)(v).....................................................................3, 8

*21 U.S.C. § 355(j)(2)(A)(viii)......................................................2, 8, 10, 15

21 U.S.C. § 355(j)(3)(C)(ii)........................................................................24

21 U.S.C. § 355(j)(4)(C)(ii)........................................................................23

21 U.S.C. § 355(j)(7)(B)............................................................................24

21 U.S.C. § 355(o)(2)................................................................................15

Pub. L. 107–109, § 11(a), Jan. 4, 2002, 115 Stat. 1416..................................15

**Other Authorities**

21 C.F.R. § 314.92(a)(1)........................................................................3, 24

21 C.F.R. § 314.94(a)(8)(iv)...........................................................3, 11, 13, 15

98557331.1

57 Fed. Reg. 17,950 at 17958-59 (Apr. 28, 1992) ...........................................................................3

57 Fed. Reg. 17,950, 17959 ...................................................................................................23

57 Fed. Reg. 17958 at 1758-17959 .........................................................................................24

FDA Docket No. FDA-2017-P-3672 .......................................................................................14

H.R. Rep. No. 98-857, pt 1 (1984)....................................................................................8, 10

H.R. Rep. No. 107-2777 (2001).............................................................................................15

U.S. Food and Drug Administration, FDA STEM Outreach, Education and
    Engagement, https://www.fda.gov/science-research/fda-stem-outreach-
    education-and-
    engagement#:~:text=More%20than%2012%2C000%20of%20FDA's,statistici
    ans%2C%20veterinarians%2C%20and%20engineers ...........................................................18

98557331.1

## INTRODUCTION

Having failed to obtain a favorable court ruling on its patents that would block MSN Laboratories Private Limited and its U.S. regulatory agent MSN Pharmaceuticals Inc. (collectively, "MSN"), from bringing their generic sacubitril/valsartan tablets to market, Novartis Pharmaceuticals Corporation ("Novartis") brings this suit against the Food and Drug Administration ("FDA") as a proxy, seeking to extend its monopoly over the billion-dollar ENTRESTO product by having this Court undo MSN's FDA approval. In doing so, Novartis asks this Court to supersede both Congressional intent and FDA's expert scientific determinations in a manner that is unprecedented and contrary to the strictures of the Administrative Procedure Act ("APA").

In challenging FDA's approval of MSN's labeling carve-out of an indication, Novartis attempts to contort the governing statute and regulations in such a way as to prevent FDA from doing what it has always done – allow generic manufacturers to remove indications from their labels that brand companies contend are covered by patent. Not only do the statute and regulations fully support FDA's decision with respect to MSN's product, but any other result would be contrary to Congressional intent in adopting "skinny labeling" as part of the Hatch-Waxman regime to promote generic drug competition and reduce overall drug prices.

Not content to stop there, Novartis also asks this Court to override FDA's scientific determination that MSN's carve out of certain modified dosing information would not render MSN's generic product less safe and effective. This is a highly technical determination, based on evaluation of scientific data, squarely within FDA's sphere of statutory authority and expertise. In arriving at this determination, the Administrative Record demonstrates that FDA reviewed and analyzed hundreds of pages of data, academic articles, and medical journals. This is exactly the

1

type of agency factual and technological determination that courts have consistently declined to disturb before, during, and after the *Chevron* era.

Finally, Novartis mischaracterizes both the depth of FDA's administrative review and the information regarding ENTRESTO's active pharmaceutical ingredient ("API") as compared to MSN's API on the Administrative Record. Consequently, Novartis seeks to reargue before this Court the scientific dispute it lost before FDA. But judges are not "scientists independently capable of assessing the validity of the agency's determination – beyond holding it to the standard of rationality required by the Administrative Procedure Act." *Serono Labs, Inc v. Shalala*, 158 F. 3d. 1313, 1327 (D.C. Cir. 1998). Largely by referring to language taken out of context from documents in the Administrative Record, Novartis asks this Court to take the drastic action of second-guessing FDA's highly technical, detailed scientific determination that MSN's product has the same active ingredient as ENTRESTO. Such an action would not be proper under the APA.

This Court should deny Novartis's motion for summary judgment and instead grant MSN's cross-motion for summary judgment.

## FACTUAL BACKGROUND

## I.    Statutory and Regulatory Background

The Federal Food, Drug, and Cosmetic Act ("FDCA") is the statute under which FDA regulates and approves new, brand name drugs (via New Drug Applications ("NDAs")) and generic drugs (via Abbreviated New Drug Applications ("ANDAs")). 21 U.S.C. §§ 355(b)(1), 355(j). To obtain approval, an ANDA applicant must demonstrate that its product (including its label) is "the same as" a reference listed drug. 21 U.S.C. § 355(j)(2). If certain uses of the reference drug are protected by a patent, an ANDA applicant may submit a "section viii" statement to carve out patent-protected indications or uses to create a "skinny label," thereby avoiding the corresponding patents. 21 U.S.C. § 355(j)(2)(A)(viii).

98557331.1

Thus, while the FDCA generally requires that the label for an ANDA product be "the same as" the label for the reference listed drug, the statute provides an exception for labeling differences resulting from the ANDA product being manufactured by a different company. 21 U.S.C. § 355(j)(2)(A)(v). These permissible differences allow for the implementation of "skinny labeling" that carves out protected indications under section viii.

In line with these provisions of the FDCA, FDA's regulations specifically provide for labeling differences related to omission of an ***indication***, as follows:

> differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or ***omission of an indication or other aspect of labeling protected by patent or accorded exclusivity*** under section 505(j)(5)(F) of the Federal Food, Drug, and Cosmetic Act.

21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).

An ANDA applicant must also demonstrate that the API of the generic drug is the same as the API of the branded drug or reference drug. 21 U.S.C. § 355(j)(2)(A)(ii),(iii). FDA regulations define "same" as "identical in active ingredient(s)." 21 C.F.R. § 314.92(a)(1). In the preamble to this final rule, FDA rejected the suggestion that, to be the same as the listed drug, the ANDA product must "exhibit the same physical and chemical characteristics and solid state forms of the drug have not been altered." 57 Fed. Reg. 17,950 at 17958-59 (Apr. 28, 1992). Instead, to determine whether two active ingredients are the "same," FDA concluded that it "will consider an active ingredient to be the same as that of the reference listed drug if it meets the same standards for identity." *Id.* at 17,959. FDA explained that "[i]n most cases, these standards are described in the U.S. Pharmacopeia (U.S.P.). However, in some cases, FDA may prescribe additional standards that are material to the ingredient's sameness." *Id.*

## II.   Relevant Factual History

Novartis' NDA No. 207620 for ENTRESTO (sacubitril/valsartan) tablets, 24 mg/26 mg, 49 mg/51 mg, and 97 mg/103 mg, was approved by FDA on July 7, 2015. AR 11-17. Since that time, Novartis has been marketing ENTRESTO (sacubitril/valsartan) without any generic competition, generating over $10.5 billion in revenue in the U.S. alone based on its monopoly pricing. *See* Dkt. No. 1 at 26.[1] As relevant to this case, ENTRESTO's approved labeling contains language directed to specific patient populations with respect to both (i) the approved indication and (ii) dosing information. AR 4244, 4246.

With respect to the approved indication, ENTRESTO was initially approved in July 2015 to treat patients with heart failure and reduced ejection fraction (HFrEF). AR 19. In February 2021, FDA approved a supplement to ENTRESTO's NDA, expanding the indication to additionally include patients with heart failure that did not have reduced ejection fraction (*i.e.*, heart failure with preserved ejection fraction, or HFpEF). AR 1466-1468. Accordingly, ENTRESTO's current labeling includes an indication covering all patients with heart failure – inclusive of both those patients who have reduced ejection fraction (HFrEF) and those who do not (HFpEF).

With respect to the dosing information, ENTRESTO's labeling contains information regarding a clinical study referred to as "TITRATION," which tested a modified dosing regimen that purported to be applicable to patients who had not previously used angiotensin-converting enzyme inhibitors ("ACE") or angiotensin receptor blockers ("ARBs"). AR 1471; *see also* AR 3857-3866. The modified dosing regimen involved a slower increase in dosage over time to reach a target dose, under the theory that this more conservative dosage increase might potentially

---

[1] Documents referenced by their docket entry are cited to the pagination in the document itself, rather than by the pagination assigned by the docket.

minimize potential side effects in ACE/ARB naïve patients. AR 3857. However, the TITRATION study did not actually study any truly ACE or ARB naïve patients – all participants in the study were subject to a 5-day run-in period in which they were dosed with 100 mg per day of sacubitril/valsartan (valsartan being an ARB), prior to initiation of the study. AR 3857-3859. The TITRATION study concluded that "[w]e did not find a significant increase in pre-defined AEs [adverse events] (including hypotension, renal dysfunction and hyperkalaemia) . . . with a more rapid uptitration . . . . Therefore, the tolerability of initiating/uptitrating sacubitril/valsartan can be considered acceptable regardless of uptitration regimen." AR 3865. The TITRATION study further cautioned that "the numbers of events are small and need to be interpreted with caution" and "the number of patients in both subgroups was too small to draw reliable conclusions." AR 3865.

Novartis owns patents that it asserts cover (i) methods of using sacubitril/valsartan to treat HFpEF patients (U.S. Patent Nos. 9,517,226, 9,937,143, and 11,135,192), and (ii) the modified dosing regimen reflected in the TITRATION study (U.S. Patent No. 11,058,667). Dkt. No. 38 at 12.

On April 18, 2019, Novartis submitted its first citizen petition to FDA ("the Active Ingredient Citizen Petition"), requesting that FDA only approve ANDAs that reference ENTRESTRO if the ANDA demonstrates API sameness based on the chemical structure of the sacubitril and valsartan active ingredients present in the finished dosage form, *i.e.,* sacubitril and valsartan in ionic coordination with sodium with 1:1:3 stoichiometry. AR 2812-2838. FDA denied Novartis's Active Ingredient Citizen Petition on May 28, 2024 after consulting with its offices for Pharmaceutical Quality, Generic Drugs, and Cardiometabolic and Endocrine Pharmacology, which unanimously disagreed with Novartis's "sameness" standard, finding that sameness could

be established based on the identity of the individual active ingredients in ENTRESTO. *See* Active Ingredient Citizen Petition Response AR 2783-2784; *see also* AR 2889-2904 (FDA consulting memos).

In September 2022, Novartis submitted a second citizen petition to FDA ("the Labeling Carve-Out Citizen Petition") requesting that FDA refrain from approving ANDAs that "carve out" labeling language related to both: (i) treatment of HFpEF patients; and (ii) the modified dosing protocol reflected in the TITRATION study. AR 3959-3990. Novartis argued that, *inter alia*, such carveouts violate FDA's regulations and would present safety and efficacy risks. Accordingly, Novartis requested that FDA refrain from approving any ANDA referencing ENTRESTO and containing such labeling alterations. AR 3963.

FDA denied Novartis's Labeling Carve-Out Citizen Petition on July 24, 2024, in an exhaustive 45-page letter detailing the reasons why the labeling alterations in question were proper under the relevant statute and regulations and would not make the related products any less safe or effective. AR 3910-3954. On the same day, FDA approved MSN's ANDA No. 213748 for a generic version of ENTRESTO, demonstrating that MSN's sacubitril/valsartan ANDA met the strict scientific and technical requirements for approval. AR 1688-1691.

## LEGAL STANDARD

Under the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "As with all claims under 5 U.S.C.S. § 706(2)(A), review focuses on whether the agency's decision was reasonable and reasonably explained, and based on consideration of the relevant factors." *Pharm. Mfg. Research Servs. v. FDA*, 957 F.3d 254, 262 (D.C. Cir. 2020). In 1983, the Supreme Court explained that, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This narrow scope of review predated *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and is therefore unaffected by the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

The high standard for overturning agency actions is even more pronounced when those actions are rooted in factual determinations made within the area of the agency's expertise. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 653-54 (1973) ("Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand."). Like the narrow scope of "arbitrary and capricious review," the deference due to these determinations was acknowledged before *Chevron* and is therefore undisturbed by *Loper Bright*. As recognized by Novartis (*see* Dkt. No. 38 at 17), *Chevron* and *Loper Bright* grappled with the issue of whether "an agency interpretation of the ***law***" is entitled to deference. In contrast, it has never been controversial that an agency's determinations of ***fact*** – especially highly technical facts within an agency's special expertise – are to be treated with serious respect. In *Loper Bright*, the Supreme Court noted that well before the advent of *Chevron* deference, "the Court often treated agency determinations of *fact* as binding on the courts, provided there was 'evidence to support the findings.'" *Loper Bright*, 144 S. Ct. at 2258 (emphasis in original). And, the *Loper Bright* Court noted that "Section 706 [of the Administrative Procedure Act] *does* mandate that judicial review of agency policymaking and factfinding be deferential." *Loper Bright*, 144 S. Ct. at 2261.

**ARGUMENT**

I.    **FDA'S APPROVAL OF MSN'S LABELING CARVE-OUT WAS RATIONAL AND WELL WITHIN ITS AUTHORITY**

    A.    **FDA's Approval Of MSN's Carved-Out Indication Is A Routine Exercise Of The Authority Granted To It By Statute And Intended By Congress**

FDA's approval of MSN's carved-out indication was a rational, routine exercise of the authority granted by Congress and consistent with the statute, FDA's regulations, prior practice, and case law. Allowing generic companies to carve out indications and other protected language from their labels in order to navigate patents or regulatory exclusivities is a long-established practice consistent with the Congressional purpose behind the Hatch-Waxman Act "to get generic drugs into the hands of patients at reasonable prices – fast." *In re Barr Labs, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). That is precisely what FDA did here.

Although generic drug labels typically match the labeling of their branded counterparts, Congress expressly authorized exceptions where "the new [ANDA] drug and the listed [brand] drug are produced and distributed by different manufacturers." 21 U.S.C. § 355(j)(2)(A)(v). One of the driving reasons for this allowance was Congress's desire to promote generic competition by "permit[ing] an ANDA [for a generic drug] to be approved for less than all of the indications for which the [branded] listed drug has been approved . . . ." H.R. Rep. No. 98-857, pt 1, at 21 (1984). Congress thus designed the "same labeling" statutory requirements to allow label changes for products produced by generic companies that are different from the branded company and further specified that generic manufacturers can avoid the related Hatch-Waxman patent litigation by submitting section viii statements under 21 U.S.C. § 355(j)(2)(A)(viii) instead of Paragraph IV certifications under 21 U.S.C. §355(j)(2)(A)(iv). The use of so-called "skinny" labeling has become a driving force in promoting generic competition and lowering drug costs. *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405 (2012) (noting that the Hatch-Waxman

Act's skinny-label provisions were enacted to "speed the introduction of low-cost generic drugs to market"); *Takeda Pharms. USA, Inc. v. W.-Ward Pharm. Corp.,* 785 F.3d 625, 631-32 (Fed. Cir. 2015) (holding that a central purpose of the Hatch-Waxman Act is to allow the sale of generic drugs for unpatented uses through the section viii carve out process).

Here, FDA approved MSN's labeling carve-out of a subset of patients within the broader indication for ENTRESTO. AR 3942-3943. Under the current approved label for Entresto, Novartis's purportedly patent-protected indication (*i.e.*, treatment of heart failure patients with preserved ejection fraction) is incorporated into a generally-stated broader indication that also incorporates non-patent protected indications (*i.e.*, treatment of heart failure patients with reduced ejection fraction). AR 3929. Specifically, the Entresto label states that the product is indicated "to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients **with chronic heart failure**." AR 4245 (emphasis added). "Patients with chronic heart failure" encompasses both the treatment of patients that are within the purportedly patent-protected indication (*i.e.*, HFpEF patients) as well those that are not (*i.e.*, those with reduced ejection fraction, which are also known as HFrEF patients). AR 3934. Therefore, MSN's label modifies the indication as follows: "to reduce the risk of cardiovascular death and hospitalization for heart failure in adult patients with chronic heart failure ~~and~~ **and reduced ejection fraction**. ~~Benefits are most clearly evident in patients with left ventricular ejection fraction (LVEF) below normal.~~" The bolded text is language that MSN was required to add to clarify that its ANDA product is not indicated for treating all patients with chronic heart failure (including HFpEF patients) but is instead limited to treating the subset of patients that have reduced ejection fraction (*i.e.*, HFrEF patients). AR 3942-3943. The insert is a *de minimis* change for the sole purpose of carving out an indication that Novartis asserts is protected by its patents. AR 3942-3945. This is exactly the type

98557331.1

of approval of a generic drug "for less than all of the indications for which the [branded] listed drug has been approved" that Congress intended under 21 U.S.C. § 355(j)(2)(A)(viii). H.R. Rep. No. 98-857, pt 1, at 21 (1984).

Relevant case law affirms FDA's authority to approve a generic drug manufacturer's carved out label without violating the same labeling requirement. For example, in *Bristol-Myers Squibb Co. v. Shalala*, this Court affirmed FDA's authority to approve indication carve-outs, holding that "the statute expresses the legislature's concern that a drug be safe and effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for use of the pioneer is a matter of indifference." 91 F.3d 1493, 1500 (D.C. Cir. 1996). While Novartis attempts to avoid this precedent by arguing that "this case was decided under the outdated *Chevron* rubric," this characterization is misleading. Dkt. No. 38 at 22-23. The plaintiff in *Bristol-Myers Squibb* based its arguments on the *Chevron* structure, and the Court acknowledges this. 91 F.3d at 1499. But, the Court's conclusion was not the result of *Chevron* deference – *i.e.*, the Court did not review the statute in question, find it was ambiguous, and then defer to FDA's interpretation as merely being "reasonable." Instead, the Court undertook its own analysis of the statutory language and legislative history and arrived at an interpretation using traditional methods of statutory construction. *Id.* at 1499-1500. In other words, the Court concurred with FDA, but did not defer to it. Thus, *Bristol-Myers Squibb* is binding precedent on the issue of whether FDA has the authority to approve generic products based on skinny labels.

Moreover, as explained in more detail below, FDA's approval of MSN's skinny label is also entirely consistent with its own regulations. Specifically, FDA's regulations permit labeling changes based on "the *omission of an indication* or other aspect of labeling protected by the patent . . . ." 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added). Leaving out an approved indication is

entirely permissible under FDA's regulations, and this is exactly what MSN did in changing its label.

**B.      FDA's Approval Of MSN's Indication Carve-Out Was Not Based On Discontinued Labeling**

Novartis argues that FDA's approval of MSN's indication carve out "violates the FDCA by reverting to a superseded ENTRESTO indication." Dkt No. 38 at 19. As explained above, MSN's label is indicated for a subset of heart failure patients, *i.e.*, those who also have reduced ejection fraction. This indication happens to be similar to ENTRESTO's previous 2015 label, which Novartis argues "cannot serve as the basis for a purported generic hoping to rely on its approval in 2024." Dkt. No. 38 at 21.

However, even a cursory review of the Administrative Record, however, demonstrates that FDA did not begin its analysis with the old ENTRESTO label, but, in fact, started with the current label in evaluating MSN's proposed carveout. Specifically, FDA states in no uncertain terms that its model labeling for comparison of MSN's carve-outs was the most recently approved ENTRESTO label from April 2024:



AR 002402. Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Additionally, in the Labeling Carve-Out Citizen Petition, FDA confirmed that "the Agency is not relying on discontinued labeling when it approves changes to the indication statement that may reflect or be similar to information from a previously approved labeling, rather the Agency is making changes to the current labeling in accordance with statutory and regulatory provisions . . . ." AR 3946. Quite simply, Novartis's assertion that FDA's analysis of MSN's carve-out was based on superseded labeling has no basis in fact, as set out in the Administrative Record.

Novartis even appears to admit as much. Novartis complains that "MSN included (and FDA unlawfully approved) an instruction on usage that was included in the labeling for ENTRESTO only when the product was approved for the broad heart failure indication." Dkt. No. 38 at 26 (emphasis removed). Novartis alleges that FDA somehow created a new "condition of use for the MSN product that was not previously approved for ENTRESTO" because MSN's approved labeling carves out HFpEF patients from its indication (i.e., similar to ENTRESTO's 2015 label), while leaving in a statement instructing physicians to use their clinical judgment (i.e., a statement that is only present in ENTRESTO's most recently approved labeling). But, if FDA only approved MSN's label based on ENTRESTO's 2015 label (as Novartis alleges), then there is no reason that the approved label would have language that only appears in the most recent ENTRESTO labeling. This language demonstrates that FDA did, in fact, use ENTRESTO's most recent label as a starting point. From there, FDA did exactly what it should do – it carved out an allegedly patent-protected indication (patients having HFpEF) while not unnecessarily changing any other language to keep the changes *de minimis*. The retention of a statement directing physicians to use their clinical judgment does not create any new indication – it does not create a new patient population, a new

disease, or new symptoms that should be treated. It merely states the obvious and ubiquitous fact that all clinicians should apply their best clinical judgment when prescribing.

As demonstrated by the excerpts above and Novartis's own admissions, FDA's evaluation of MSN's label relied on Novartis's current label and carved out the protected indication (*i.e.*, the HFpEF patient population) from the currently approved label. While it just so happens that this carve-out matches certain language from a prior version of the label before Novartis obtained approval to treat the additional patient population, there is nothing in the statute or regulations that prohibits an indication carve-out on the basis that certain language matches language used in an earlier-approved label.

### C.   Novartis Urges A Reading Of FDA's Regulations That Is Inconsistent With Their Plain Text

Perhaps realizing that FDA's action falls squarely within both its statutory mandate and its own regulations, Novartis attempts a creative rewriting of 21 C.F.R. § 314.94(a)(8)(iv). Specifically, Novartis argues that 21 C.F.R. § 314.94(a)(8)(iv) requires that labeling changes must take the form of "omitting (i.e. deleting) ***language***." Dkt. No. 38 at 25. Accordingly, Novartis asserts that FDA's approval of MSN's labeling is impermissible because it adds language to the approved labeling for ENTRESTO. Dkt. No. 38 at 24-26. Novartis's characterization of 21 C.F.R. § 314.94(a)(8)(iv), however, is simply inaccurate. Nothing in the regulation prohibits – or even mentions – an omission of ***language*** at all. Rather, the regulation permits labeling differences directed to "the omission of an ***indication*** . . . ." 21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).

Nothing in the regulation places restrictions on how the omission of an indication can be accomplished and neither the statute nor regulations prohibit the addition of words or phrases as a method for carving out an indication – this restriction is entirely a creation of Novartis. While Novartis asserts that "FDA points to no like circumstance where additions to labeling have been

permitted," this is simply wrong. Dkt. No. 38 at 28. To the contrary, as noted in FDA's response to Novartis's Labeling Carve-Out Citizen Petition, the agency has permitted the omission of an indication via a carveout where the only way to omit the protected indication was to add words. *See* AR 3944-3945. For example, in a matter involving facts that are nearly identical to the facts at issue here, for the drug Velcade (bortezomib), FDA allowed the use of an older version of an indication with added language that limited the patient population to second-line lymphoma patients. *Id*. Due to the way the labeling was written, the only way to omit the protected indication was to add words to the labeling to specify the more limited patient population. AR 3945. Specifically, the labeling was modified as follows: "for the treatment of patients with mantle cell lymphoma **who have at received at least 1 prior therapy**." *Id*. The bolded language represents the added language departing from the branded indication. FDA found this approach to be consistent with the agency's past practice as well as with the scope of Velcade's exclusivity. FDA Docket No. FDA-2017-P-3672, FDA response to Citizen Petition Regarding Velcade (bortezomib) (November 6, 2017) at 14 *available at* https://www.regulations.gov/document/FDA-2017-P-3672-0022. It was thus proper for FDA to do the same with respect to MSN's ANDA here in order for FDA to meet the requirement that an agency treat like situations alike. *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

Novartis further argues that "Congress knows how to permit the addition of language as an exception to the same labeling requirement, but chose not to in our case." Dkt. No. 38 at 24. Novartis bases this argument on the assertion that FDCA provisions regarding pediatric labeling expressly grant "FDA the authority to add – rather than just omit – language specific to the safe use in pediatric patients . . . ." Dkt. No. 38 at 24. This argument, however, is still based on

Novartis's erroneous assertion that the skinny-labeling provisions of the FDCA and/or FDA's regulations are directed to the addition or omission of ***language***. As explained above, they are not. 21 C.F.R. § 314.94(a)(8)(iv) permits "omission of an ***indication***," which is exactly what FDA has approved here. Neither statute nor regulations restrict the manner in which this omission may be accomplished, no matter how much Novartis might like them to.

Further, the pediatric labeling provisions referenced by Novartis (21 U.S.C. § 355(o)(2)) were added nearly 20 years after the Hatch-Waxman Act was passed in 1984. *See* amended Pub. L. 107–109, § 11(a), Jan. 4, 2002, 115 Stat. 1416.  They also have an entirely different purpose. While section viii of the Hatch-Waxman Act is directed towards allowing carve outs of patent protected information to bring generic drugs to market more quickly, the purpose of 21 U.S.C. § 355(o)(2) is to "ensure that drugs used in children are properly studied and labeled for pediatric use." H.R. Rep. No. 107-2777, at 20 (2001). As noted by the D.C. Circuit, "[i]t would be manifestly inappropriate to rely on statutes, regulations . . . having limited purpose and applicability to interpret, in derogation of plain meaning, another statute having an unrelated purpose." *Matthews v. Commissioner*, 907 F.2d 1173, 1178 (D.C. Cir. 1990); *see also Ford Motor Co. v. United States*, 908 F.3d 805, 812 (Fed. Cir. 2018) (finding that precedent does not require statutes to be interpreted in light of "prior, unrelated statutes").

### D.     Novartis's Novel Interpretation Of FDA's Regulations Runs Directly Contrary To The Congressional Intent Behind 21 U.S.C. § 355(j)(2)(A)(viii).

Not only does Novartis's rewrite of FDA's regulations stray from the plain language and conflict with previous FDA practice, it would also eviscerate 21 U.S.C. § 355(j)(2)(A)(viii) and frustrate the Congressional intent behind it. The skinny-labeling provisions of the Hatch-Waxman Act execute Congress's intent to encourage generic competition by allowing generic manufacturers to seek approval for a drug with fewer indications than the listed drug. If the Court

accepts Novartis's revision of FDA's regulations, brand companies would be permitted to extend their monopolies via careful drafting of their labeling and indications. To prohibit addition of language to a label, as Novartis requests, would create a precedent where any brand manufacturer could circumvent section viii carve outs entirely by carefully wording its indications.

For example, instead of drafting a label to treat Pox A, Pox B, and Pox C (where Pox C is still protected under a patent), a manufacturer could draft an indication for "all Pox variants." Under Novartis's theory, a generic manufacturer would be prohibited from submitting an indication for "all Pox variants, **except for Pox C**" or for "Pox A and Pox B" because it would require "adding" words or phrases to the label. Such an absurd result that is clearly contrary to Congressional intent should not be countenanced by the Court. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S. Ct. 3245, 3252, 73 L.Ed.2d 973 (1982).

FDA's decision to approve MSN's ANDA label was thus rational and well within the statutory and regulatory provisions, along with being consistent with FDA's prior determinations and Congressional purpose in lowering drug prices by allowing skinny labels. *Teva Pharm. Indus. v. Crawford*, 410 F.3d 51, 54 (D.C.Cir.2005) (The Hatch-Waxman Act benefits consumers by "get[ting] lower-cost drugs to market."); *Actavis Laboratories, FL, Inc. v. U.S.*, 161 Fed. Cl. 334, 352 (2022) ("Congress wanted to promote the introduction of affordable generic drugs to the market as quickly as possible"). Novartis attempts to undercut the entire section viii labeling carveout regime, which not only extends far beyond the plain statutory and regulatory text, but also runs directly contrary to Congressional intent. *A/S v. Lupin Ltd.*, 87 F.4th 1361, 1366 (Fed. Cir. 2023) ("The Hatch-Waxman Amendments authorize the FDA to approve the marketing of a generic drug for particular unpatented uses . . . so that a product with a label matching them can quickly come to market. The statutory scheme, in other words, contemplates that one patented use

will not foreclose marketing a generic drug for other unpatented ones."). Novartis's summary judgment motion should therefore be denied, and MSN's cross-motion for summary judgment should be granted.

## II.   FDA'S FACTUAL DETERMINATIONS AS TO DRUG SAFETY AND EFFICACY ENJOY HIGH LEVELS OF RESPECT AND SHOULD NOT BE OVERTURNED

Trying to wedge this case into the Supreme Court's recent *Loper Bright* decision, Novartis brazenly argues that FDA's determination that MSN's product is not "less safe or effective than the listed drug" with the carveout of the TITRATION study information is somehow "not a question of science." Dkt. No. 38 at 35. But, it's difficult to think of an agency determination that would be more steeped in science. As the thousands of pages in the Administrative Record demonstrate, FDA thoroughly considered this deeply scientific assessment and made a factual determination based on the extensive expertise of its staff that MSN's product will not be less safe or effective without the TITRATION study information in its label. It is certainly not the role of this Court to second-guess that determination.

Novartis simply has not met the heavy burden required for a court to overturn a factual, scientific determination made by an agency utilizing its expertise. As previously recognized by this Court, "[t]he Supreme Court has long recognized that agency judgments on technical issues within their scope of expertise are to be given persuasive weight based on their thoroughness and validity of the agency's reasoning." Dkt. No. 23 at 12-13; *see also Skidmore*, 323 U.S. at 140; *Weinberger*, 412 U.S. at 653-54 ("Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand."); *Loper Bright*, 144 S. Ct. at 2261 (noting that the APA mandates that judicial review of agency factfinding be deferential).

Courts recognize that FDA's determination of safety and efficacy is a highly factual inquiry, demanding a rigorous scientific evaluation and the experience and expertise to make that possible. *Weinberger*, 412 U.S. at 653-54 ("The determination whether a drug is generally recognized as safe and effective . . . necessarily implicates complex chemical and pharmacological considerations."). Accordingly, courts have acknowledged that FDA, with its staff of more than 12,000 scientists,[2] is best suited to undertake this analysis. *Pharm. Mfg. Research Servs.*, 957 F.3d at 262 ("In the context of a challenge to the FDA's decision making, the court gives a high level of deference to the agency's scientific analysis of the evidence before it, and must avoid unduly second-guessing those scientific judgments."); *Premo Pharmaceutical Laboratories*, 629 F.2d at 803 ("The entire statutory scheme envisages that the FDA will perform the difficult task of investigation and scientific evaluation usually required to determine whether a drug product is safe and effective.").

As previously noted by this Court, in evaluating whether MSN's carve out of the § 2.6 dosing regimen was permissible, FDA engaged in an analysis that was "highly technical . . . thorough and well-reasoned." Dkt. No. 38 at 13. Well over 300 pages of the Administrative Record are dedicated to this thorough analysis. *E.g.*, AR 3857-4134, 4508-4544, 5462-5487. In conducting its safety evaluation on this issue, FDA reviewed not only the results of the TITRATION study itself (AR 3857-3866), but also hundreds of pages of scientific articles related to the effects and risks of dosing heart failure patients with ARBs, ACEs, and similar drugs. *E.g.*, AR 3857-4134, 4508-4544, 5462-5487.

---

[2]  *See* U.S. Food and Drug Administration, FDA STEM Outreach, Education and Engagement, https://www.fda.gov/science-research/fda-stem-outreach-education-and-engagement#:~:text=More%20than%2012%2C000%20of%20FDA's,statisticians%2C%20veterinarians%2C%20and%20engineers.

This voluminous body of research and scientific analysis is summarized in FDA's 45-page response to Novartis's Labeling Carve-Out Citizen Petition. AR 3910-3954. As summarized, FDA expressly concluded that "*the omission of the subsection 2.6 modified dosing regimen would not render [MSN's ANDA product] less safe or effective . . . .*" AR 3940 (emphasis added). After review of the scientific data underlying the § 2.6 dosing regimen, FDA concluded that it is "***unknown***" whether the § 2.6 dosing regimen is any safer for ACE/ARB naïve patients because (i) both tested groups showed similar rates of adverse effects and (ii) the data was "not robust" and had limited "generalizability to truly naïve patients" because all tested patients were subjected to ACE/ARB dosing to determine tolerability prior to the study. AR 3949.  FDA did not reach these conclusions in a vacuum. Rather, these conclusions are based on and supported by the authors of the TITRATION study themselves, who concluded that "[w]e did not find a significant increase in pre-defined AEs [adverse events] (including hypotension, renal dysfunction and hyperkalaemia) . . . with a more rapid uptitration . . . . Therefore, the tolerability of initiating/uptitrating sacubitril/valsartan can be considered acceptable ***regardless of uptitration regimen***." AR 3865 (emphasis added). The TITRATION study itself also recognized the limitations of its own data, noting that both the number of adverse events observed and the number of patients studied were small and therefore the results have limited generalizability and "need to be interpreted with caution." AR 3865.

Novartis attempts to obscure the clear conclusions of both the FDA and the TITRATION study itself by presenting mere snippets of FDA's reasoning, divorced from their proper context. For example, Novartis cites to isolated phrases noting that the modified dosing regimen "*may* reduce risk" or that patients "*might* benefit." Dkt. No. 38 at 29-30, 32-33. While FDA's Response does indeed use the quoted phrases, it is in service of the larger conclusion that Novartis would

like to ignore – that, according to prevailing scientific standards and norms, the data in the TITRATION study is inadequate to show that the § 2.6 dosing regimen provides any benefit to the patient population in question. AR 3949.  In asking this Court to override this conclusion, Novartis is asking the Court to second guess FDA's determinations as to (i) the adequacy of certain methodologies for clinical studies, (ii) how far scientific data in a particular patient population may be extended to apply to other patient populations, and (iii) the level of medical risk indicated by clinical data.

Recognizing that this is an extreme request, Novartis tries to reframe the issue by arguing that FDA is not applying the correct standard. Dkt. No. 38 at 32-33. Novartis argues that "the agency asserts that *there is no need for such patients to receive the 'safest and best-tolerated option*,'" which, if true, would be a departure from the "no less safe and effective" standard of Section 314.127(a)(7). *Id.* But, this argument represents multiple layers of obfuscation. First, FDA never characterized the modified dosing regimen as the "safest and best tolerated" option – those were Novartis's words, which FDA rejected. AR 3949. Second, FDA has never said that "*there is no need for patients to receive the safest and best tolerated option*." Again, these are Novartis's words. Dkt. No. 38 at 32-33. What FDA actually stated is that it is "***unknown***" if the § 2.6 dosing regimen is the safest and best tolerated option, due to deficiencies in the supporting data. AR 3949. Therefore, there is no "***scientific basis*** to conclude . . . that the standard ENTRESTO dosing regimen puts such patients at greater risk of adverse reactions or that section 2.6 is 'critical' to ensuring safe and effective use." AR 3949 (emphasis added). Novartis has constructed its argument about the "standard" out of whole cloth and is using it as a smokescreen for what it actually takes issue with – FDA's scientific conclusions as to the significance of the TITRATION data and the § 2.6 dosing regimen.

No matter how it is framed by Novartis, such a review of the scientific merits of FDA's determination is beyond the narrow scope of review for prohibited "arbitrary and capricious" behavior. *Friedman v. FAA*, 890 F.3d 1092, 1098-99 (D.C. Cir. 2018). Courts should not "step into the FDA's shoes and reassess its scientific judgments—a role that courts are ill-equipped to play under the guise of the APA's arbitrary and capricious standard." *Pharm. Mfg. Research Servs.*, 957 F.3d at 265; *see also Cytori*, 715 F.3d at 927. Novartis's motion should thus be denied, and MSN's cross-motion for summary judgment should be granted.

III. **THE COURT SHOULD NOT SECOND-GUESS FDA'S SCIENTIFIC DETERMINATION THAT MSN'S GENERIC DRUG HAS THE SAME ACTIVE INGREDIENTS AS ENTRESTO**

Like the carve-out of the TITRATION study information, Novartis also asks this Court to second-guess FDA's well thought out, detailed, scientific determination regarding the sameness of the active ingredient in MSN's product. *Loper Bright*, 144 S. Ct. at 2261 (APA mandates that judicial review of agency factfinding be deferential); *Skidmore*, 323 U.S. at 140; *Weinberger*, 412 U.S. at 653-54 ("Threshold questions within the peculiar expertise of an administrative agency are appropriately routed to the agency, while the court stays its hand."). The APA simply does not empower this Court to second guess FDA's detailed, scientific determination that MSN's generic product has the same active ingredient as ENTRESTO.

Specifically, Novartis argues that FDA's determination of "sameness" was wrong because "a generic that is the salt of a drug is not the same active ingredient as the anionic form of the drug." Mot 36. Novartis's argument is first based on the presumption that MSN's product and Novartis's product exist in different chemical forms (i.e., a salt vs. an anionic compound).[3] They

---

[3] A salt is an ionic compound that exists in a ratio that results in no electrical charge, whereas an anionic compound contains a negative charge.

do not. FDA describes a salt as a compound that results from the replacement of a hydrogen ion (an acid) by a metal (*e.g.*, sodium). FDA Co-Crystal Guidance AR 3584. While a complex (like the API in ENTRESTO) can technically be a "salt" in that it can consist of a combination of compounds containing metals bound to acids (*i.e.*, a sodium bound to a sacubitril acid), "co-crystals are distinguished from salts because unlike salts, the components that co-exist in the co-crystal lattice with a defined stoichiometry [ratio of components] interact nonionically." FDA Co-Crystal Guidance AR 3582 (emphasis added). What this means is that, for a co-crystal, the components are not held together by strong ionic (electrically charged particles) bonds, but rather by weaker interactions.

This is the case with the API in ENTRESTO. In evaluating Novartis's NDA, FDA concluded that, based on the composition of the API in ENTRESTO, it was scientifically accurate to describe the drug ███████████████████████████████ AR 810. However, for naming purposes, FDA also disagreed with Novartis that ENTRESTO should be referred to as ███████████████████████████████████

███████████████████████████████████

██████ *Id.* That is, FDA determined that the sodium molecules in the complex are arranged in a way that causes the product to not behave like a typical single active ingredient in salt form. AR 2801. Therefore, FDA viewed ENTRESTO as a fixed combination of sacubitril sodium and valsartan disodium. AR 58-59. According to FDA, ███████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

Novartis complains that FDA changed course in approving MSN's ANDA by "belatedly identifying [ENTRESTO'S] API as 'sacubitril sodium' and 'valsartan disodium,'" which Novartis argues is inconsistent with how the product is listed in the *Orange Book*. Dkt. No. 38 at 38. However, the nomenclature FDA chooses to use in the *Orange Book* is irrelevant to FDA's regulatory obligation to evaluate "sameness" of a generic drug based on the standards of identity of the generic drug to the reference listed drug. 57 Fed. Reg. 17,950, 17959. Novartis's hyper-fixation on wordsmithing these terms and how the products are listed in the *Orange Book* simply distracts from FDA's well-reasoned, scientific determination that MSNs product and ENTRESTO contain the same active ingredient. AR 1688-1692. Importantly, MSN's *Orange Book* listing lists the active ingredients in the exact same nomenclature as ENTRESTO (i.e., sacubitril and valsartan). *See* ████████████████████████████████████████████

██████████████████████████████████████

The *Orange Book* nomenclature has no impact on the regulatory and statutory requirement of "sameness." FDA is required to approve an ANDA unless, among other things, the ANDA contains insufficient information to show that the active ingredients are the same as those of the listed drug. 21 U.S.C. § 355(j)(4)(C)(ii). The statutory provisions do not describe the type or amount of information that an ANDA applicant must submit to demonstrate that the APIs in the generic drug are the same as the APIs in the reference drug, nor does the statute describe the type

or amount of information on which FDA may rely in determining whether the ANDA applicant has provided sufficient information to show the APIs are the same. However, FDA regulations implementing these statutory provisions state that the term "same as" means, among other things, "identical active ingredient(s)." 21 C.F.R. § 314.92(a)(1). In the preamble to the final rule implementing the Hatch-Waxman regulations, FDA rejected the suggestion that active ingredients "exhibit the same physical and chemical characteristics, that no additional residues or impurities can result from the different manufacture or synthesis process, and that the stereochemistry characteristics and solid state forms of the drug have not been altered." 57 Fed. Reg. 17958 at 1758-17959. FDA adopted a more flexible approach, determining that APIs of a generic and reference drug are the same if the drugs "meet the same standards for identity." *Id.*

The FDA regulation and rulemaking preamble on which Novartis relies simply do not require that the active ingredient in a generic drug product be a chemical clone of the active ingredient in the brand name product. The statute is silent on the type of information upon which FDA may rely, only stating that the information must not be "insufficient" to show the active ingredients are the same. 21 U.S.C. § 355(j)(3)(C)(ii). This broad grant of discretion to the agency with respect to the information it may consider in making a finding of "sameness" indicates that Congress did not have a precise definition of the term in mind. *See Schering Corp. v. FDA*, 51 F.3d 390, 399-400 (3d Cir.1995)

(holding that FDA's interpretation of 21 U.S.C. § 355(j)(7)(B) "as not limiting its discretion to determine what tests or studies would provide it with appropriate information from which to determine bioequivalence is a reasonable construction of the Act"). The FDA's determination of what is required to establish "sameness" for purposes of the FDCA rests on the "agency's evaluations of scientific data within its area of expertise," and hence is entitled to a

24

"high level of deference" from this Court. *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1490 (D.C. Cir. 1995). Thus, courts in this Circuit have upheld FDA's decision that an ANDA product has the "same" active ingredient as the reference listed drug, even when neither ingredient has been fully characterized. *Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998).

Considering the respect owed to FDA's scientific expertise, Novartis's assertions that "the MSN product does not have the same active ingredient as ENTRESTO" based on the "chemical form" of MSN's API compared to ENTRESTO's API are unavailing. Dkt. No. 38 at 36. In response to Novartis's Active Ingredient Citizen Petition, FDA explained that the agency determined that ENTRESTO contains "sacubitril sodium and valsartan disodium, which exist in the form of a hemipentahydrate co-crystal" and is treated as a "fixed-dose combination product" as opposed to a "single active ingredient in salt form" because the bonds holding the complex together "are weak as well as non-covalent and non-ionic." AR 2800-2801. Therefore, the agency determined that "absent a showing that the physical form of the ENTRESTO co-crystal impacts the safe or effective use of the drug, FDA generally expects generic applicants to demonstrate 'sameness' based on the identity of the individual active ingredients (sacubitril sodium and valsartan disodium)." AR 2801.

In making this determination, FDA thoroughly considered all of Novartis's arguments, and after extensive deliberation, ultimately concluded that a generic applicant could satisfy the statutory requirement for active ingredient sameness through a showing of sacubitril, valsartan, and sodium being present in the same stoichiometric ratio as the reference listed drug. FDA's Office of Regulatory Policy consulted with FDA's Office of Policy for Pharmaceutical Quality, Office of Generic Drugs, and Division of Cardiometabolic and Endocrine Pharmacology, all of which unanimously rejected the propositions presented in Novartis's Active Ingredient Citizen

Petition after careful scientific and technical deliberation. *See* AR 2889-2908. FDA's Active Ingredient Citizen Petition Response and the Administrative Record demonstrate that the FDA examined all important aspects of the issues relevant to approval and explained its decision in a manner consistent with all the evidence before it. FDA's carefully reasoned decision, grounded in the exercise of its best scientific judgment, easily passes muster under the standards of the APA. *Loper Bright*, 144 S. Ct. at 2261 (APA mandates judicial review of agency factfinding be deferential); *Skidmore*, 323 U.S. at 140.

## CONCLUSION

For all of the above reasons, this Court should deny Novartis's motion for summary judgment and instead grant MSN's cross-motion for summary judgment.

26

Dated: September 16, 2024

Respectfully submitted,

POLSINELLI PC

By:    /s/ Chad Landmon
CHAD LANDMON
(D.C. Bar No. 990347)
SUZANNE BASSETT
(D.C. Bar No. 888314688)
1401 Eye ("I") Street, N.W., Suite 800
Washington, DC 20005
(202) 783-3300
Fax: (202) 783-3535
clandmon@polsinelli.com
sbassett@polsinelli.com

COREY CASEY (admitted pro hac vice)
900 W. 48th Place, Suite 900
Kansas City, MO 64112
(816) 753-1000
Fax: (816) 753-1536
ccasey@polsinelli.com

KENDALL GURULE (admitted pro hac vice)
1401 Lawrence Street, Suite 2300
Denver, CO 80202
(303) 572-9300
Fax: (303) 527-7883
kgurule@polsinelli.com

*Attorneys for MSN Pharmaceuticals Inc. and MSN
Laboratories Private Limited*

## CERTIFICATE OF SERVICE

This is to certify that on September 16, 2024, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send electronic notification of such filing to all counsel of record.

   /s/ Chad Landmon
*Attorney for MSN Pharmaceuticals Inc. and MSN
Laboratories Private Limited*

98557331.1